UNITED STATES DISTRICT COURT
EASTERN DISRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ NOV 16 2015 ★
LONG ISLAND OFFICE

------------------------------------------------------------X

JOHN GLEESON, in His Own Right and as Co-Administrator of the Estate of JOHN P. GLEESON, Deceased, MARGARET GLEESON, in Her Own Right and as Co-Administrator of the Estate of JOHN P. GLEESON, Deceased, and DONNA DEMPSEY, on behalf of and as the Natural Parent and Guardian of the Property of both E. A. G., an Infant and J. P. G., an Infant,

Plaintiffs,

Case No. CV-15 6487

VERIFIED COMPLAINT

-against-

COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU COUNTY SHERIFF'S DEPARTMENT, MICHAEL J. SPOSATO, Individually and as Sheriff of Nassau County, ARMOR CORRECTIONAL HEALTH SERVICES, INC., ARMOR CORECTIONAL HEALTH SERVICES OF NEW YORK, INC., NASSAU COUNTY CORRECTIONS OFFICERS, "JOHN DOES 1-10," in their Individual and Official Capacities, ARMOR CORRECTIONAL HEALTH SERVICES, INC. EMPLOYEES and AGENTS, "JOHN and JANE DOES 11-20," in their Individual and Official Capacities,

Defendants.

AZRACK, J.

LINDSAY, M

JURY TRIAL DEMANDED

------------------------------------------------------------X

Plaintiffs, by their attorneys, The Pascarella Law Firm, PLLC, for their Verified Complaint against the defendants, allege as follows:

**PRELIMINARY STATEMENT**

1. This is an action that arises out of the needless, shameful and preventable death of John P. Gleeson (hereinafter, "Gleeson"), a 40-year old father of two young children, while he was an inmate in the care and custody of Nassau County (the "County"), the Nassau County Sheriff's Department ("NCSD") and the

staff of the Nassau County Correctional Center ("NCCC") and in the health and medical care of the staff of Armor Correctional Health Services, Inc. ("Armor") during Gleeson's detention at the NCCC.

2. At all relevant times herein, it was the duty and obligation of Armor to administer to the health needs of and to medically tend to and treat the inmates of the NCCC. Concomitantly, it was the duty and obligation of the County and the NCSD to care for, protect and insure the welfare of the said inmates.

3. Armor had entered into a contract with the County of Nassau to provide health services and medical treatment for the inmates of the NCCC, which contract was (and is) in full force and effect at all relevant times herein, including to the present time.

4. Gleeson was denied competent, necessary, medically obvious and timely care by the defendants. The pleas of Gleeson's fellow inmates, who plainly could apprehend that that he was experiencing a very serious and severe medical incident that required immediate medical attention, care and treatment by an experienced and competent physician, were ignored by NCCC and Armor staff.

5. Plaintiffs seek redress against the defendants for their intentional, unconstitutional, reckless and otherwise tortious conduct and for the deliberate indifference exhibited by these defendants, including, without limitation, with regard to policies, customs, practices, protocols, training of personnel, supervision of personnel, due process and the humane treatment of individuals that deprived Gleeson of necessary medical attention, his constitutional entitlements and of his life.

6. Defendants had and have known about the deficient, incompetent, unprofessional and negligent health care and medical treatment of inmates at the NCCC for years and had and have failed to make reasonable and effective efforts to remedy the situation.

7. There was a long and pervasive history of deficient health and medical care at the NCCC so as to establish a pattern of deficient health and medical care.

8. The said pattern of deficient health and medical care demonstrates actual knowledge of the County and all other defendants.

9. The said well-worn pattern of deficient health and medical care established, constituted and became policies, practices and customs of the defendants.

10. Allowing such policies, practices and customs to come into existence, to continue and to persevere constituted deliberate indifference on the part of the defendants.

11. The significant pattern of similar violations of health and medical care at the NCCC signified a need to train and to supervise.

12. The County, NCSD, NCCC and Sheriff (hereinafter, collectively referred to as the "municipal defendants") failed to train and to supervise or to adequately train and to adequately supervise NCCC staff, including corrections officers and medical staff, amounting to deliberate indifference to the constitutional rights of NCCC inmates, including Gleeson.

13. There was an obvious need for such training to avoid the violation of Gleeson's (and other inmates') constitutional rights, and the said defendants failed to correct the situation regarding this need for training.

14. There was a pattern of similar constitutional violations by untrained or improperly trained employees and agents of the aforesaid defendants.

15. There was a direct causal link between the aforesaid inadequate training and the deprivation of Gleeson's constitutional rights.

16. The aforesaid defendants failed to establish a policy or practice that would protect Gleeson (and other NCCC inmates) against deficient health and medical care.

17. Armor failed to train and to supervise or to adequately train and to adequately supervise NCCC medical staff and corrections officers, amounting to deliberate indifference to the constitutional rights of NCCC inmates, including Gleeson.

18. There was an obvious need for such training to avoid the violation of Gleeson's (and other inmates') constitutional rights, and Armor failed to correct the situation regarding this need for training.

19. There was a pattern of similar constitutional violations by untrained or improperly trained employees, agents and subcontractors of Armor at the NCCC and at other correctional facilities for which Armor provided health and medical services, in New York State and elsewhere.

20. Armor failed to establish a policy, custom or practice that would protect Gleeson (and other NCCC inmates) against deficient health and medical care.

21. There was a direct causal link between the aforesaid inadequate training and the deprivation of Gleeson's constitutional rights.

22. There was an obvious need for supervision of NCCC staff, including corrections officers and medical staff, to avoid violation of Gleeson's (and other inmates') rights, and the municipal defendants and Armor failed to adequately supervise the aforesaid staff.

23. Various supervisors employed by the County and the NCSD, including Sheriff Sposato, directly participated in the constitutional violations alleged herein.

24. Various supervisors employed by the County and the NCSD, including Sheriff Sposato, promulgated, created, implemented and/or were responsible for or acquiesced in the continued operation of policies, practices or customs that violated the Constitution of the United States.

25. Various supervisors of Armor directly participated in the constitutional violations alleged herein.

26. Various supervisors of Armor promulgated, created, implemented and/or were responsible for or acquiesced in the continued operation of policies, practices or customs that violated the Constitution of the United States.

27. Municipal policies, customs and/or practices were the moving force behind or cause of the constitutional violations of Gleeson's rights.

28. Armor's policies, customs and/or practices were the moving force behind or cause of the constitutional violations of Gleeson's rights.

29. In contravention of their duty and obligation to provide proper health and medical care services for inmates at the NCCC, and in violation of the

constitutional rights of those inmates, the municipal defendants ignored the specific findings and recommendations, relating to specific deficiencies and failures at the NCCC, at various points in time, of the New York State Commission of Correction, a lawful and duly constituted agency of the State of New York tasked with the duty to investigate and oversee the care provided by correctional and holding facilities within the State.

30. Defendants' deficiencies, incompetence, medical negligence and actions and failures to act caused the wrongful death of Gleeson.

31. This action is brought seeking monetary relief, including compensatory, punitive and pecuniary damages, costs, including legal fees, and declaratory and injunctive relief.

## JURISDICTION AND VENUE

32. The within action is authorized by and brought pursuant to the laws of the United States, including 42 U.S.C. §§1983 and 1988, the United States Constitution, including the Fourteenth Amendment of the said Constitution, and the laws and Constitution of the State of New York.

33. The Court has subject matter jurisdiction under 28 U.S.C. §§1331 and 1343(a)(3) and has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§2201 and 2202. This Court may grant injunctive relief as authorized by 28 U.S.C. §§2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

34. Plaintiffs further invoke the supplemental jurisdiction of this Court to adjudicate pendant state law claims pursuant to 28 U.S.C. §1367.

35. Venue is proper in the Eastern District of New York under 28 U.S.C. §1391(b)(2) because it is where the events giving rise to this action occurred.

**PARTIES**

36. Plaintiff John Gleeson is the natural father of Gleeson and lives in Nassau County, New York, in the Eastern District of New York. He was appointed co-administrator of the estate of Gleeson via limited letters of administration issued on or about June 18, 2015. These letters were amended on or about July 27, 2015.

37. Plaintiff Margaret Gleeson is the natural mother of Gleeson and lives in Nassau County, New York, in the Eastern District of New York. She was appointed co-administrator of the estate of Gleeson via limited letters of administration issued on or about June 18, 2015. These letters were amended on or about July 27, 2015.

38. Plaintiff Donna Dempsey is the former wife of Gleeson; they became divorced on or about July 26, 2006. She is the natural mother of the two issue of the marriage with Gleeson—E. A. G, was born in 2002, and J. P. G. was born in 2004. Letters of Guardianship (of the Property) for each of the aforesaid children were issued to Donna Dempsey on or about October 22, 2014.

39. E. A. G. is the infant daughter of Gleeson and Donna Dempsey, and she presently lives with her mother in Nassau County, New York, in the Eastern District of New York. At the time of her father's death, E. A. G., who was very close to her father, was eleven (11) years old.

40. J. P. G. is the infant son of Gleeson and Donna Dempsey, and he lives with his mother in Nassau County, New York, in the Eastern District of New York. At

the time of his father's death, J. P. G., who also was very close to his father, was nine (9) years old.

41. Gleeson, the deceased, was a high school graduate who completed one year of college; he also attended an electrician's trade school. In fact, he was completing an electrician's apprenticeship and was a member of an electrical workers' union. Gleeson was raised by his parents in Oceanside, New York and had a residence in Oceanside at the time of his death, at age 40. In February, 2002, he married Donna Dempsey, a marriage that ended in divorce in 2006, as aforesaid. There were two children of the said marriage, to wit: E. A. G. and J. P. G., as set forth hereinabove.

42. Although divorced, Donna Dempsey and Gleeson maintained a close friendship and sought, as much as possible, to provide a family relationship and atmosphere for and with their children. John and his children were together quite frequently, almost on a daily basis, and they had a close relationship. The four family members often went on vacations together.

43. Defendant Nassau County, a municipal corporation, is a political subdivision of the State of New York. The County has ultimate responsibility for the NCCC, which is operated by the NCSD.

44. Defendant NCCC is located in East Meadow, New York, in the Eastern District of New York. The NCCC is operated by the NCSD pursuant to Article XX of the Nassau County Charter. It is the largest county correctional facility in the State of New York. The facility has a maximum capacity of 1,916 beds, and its inmate population includes pretrial detainees, convicted prisoners serving sentences of up

to one (1) year, certain federal prisoners in transit and inmates alternately housed in Suffolk County and New York City.

45. Defendant NCSD is a department of the defendant County. It is headed by a Sheriff, who is its chief supervisor and administrator. The Sheriff, among other duties, oversees the operations of the NCSD, which includes the daily operation of the NCCC. The Sheriff is responsible for supervising deputy sheriffs, corrections officers and other staff, and he participates in formulating and establishing the practices, customs and policies of his department and the NCCC, as well as overseeing those practices, customs and policies.

46. Defendant Michael J. Sposato ("Sposato") is and has been, at all relevant times, the Sheriff of the NCSD.

47. Defendant Armor is a foreign corporation that has contracted with the County and/or the NCSD to provide health and medical services to the inmates of the NCCC. It took over this function from the Nassau Health Corporation and Nassau University Medical Center ("NUMC"), although use is to be made of the facilities and staff of the NUMC as needed.

48. Upon information and belief, Armor was founded by Jose' J. Armas, who serves as its president, and was incorporated in Florida in 2004. Armor's present CEO is Bruce Teal. Its principle place of business is located at 4960 SW 72nd Avenue, Suite 400, Miami, Florida 33155. (Note: Upon information and belief, thirty-two (32) corporations list the address of 4960 SW 72nd Avenue, Miami, Florida 33155 as their principal place of business).

49. Armor is responsible, at least, in part, for creating, implementing and enforcing policies, practices, customs, guidelines and protocols applicable to its duty and obligation to provide health and medical services to inmates of the NCCC.

50. Armor was, at all times relevant hereto, endowed by the County and the NCSD with powers and functions that are governmental in nature so that Armor became an agency or instrumentality of the County and the NCSD, and, therefore, subject to the constitutional obligations, constraints and limitations of the County and the NCSD.

51. Defendant Armor Correctional Health Services of New York, Inc. (hereinafter, "Armor New York"), is a foreign corporation and, upon information and belief, is a subsidiary, affiliate, alter ego or spin-off of Armor, and appears to have been formed specifically as a result of or in relation to Armor's contract with the County. It was incorporated in Florida in 2014, and its principal place of business is located at 4960 SW 72nd Avenue, Suite 400, Miami, Florida 33155, the same address as the principal place of business for Armor. (Armor and Armor New York may be collectively and alternatively referred to as the "Armor Defendants").

52. Defendants "John Does 1-10" are Corrections Officers, who were or still are employees, servants and agents of the County, performing duties and services, including as supervisors, at the NCCC at the relevant times referred to in the within action. Their names are unknown or not positively known to plaintiffs but are known to the defendants. With respect to the acts and omissions set forth in this Complaint, the Correction Officer defendants, including supervisory defendants,

each acted under color of state law in the course of his duties and functions as an employee, servant, and/or agent of the County.

53. Defendants "John and Jane Does 11-20" are employees, servants, agents or independent contract workers for Armor and/or Armor New York, who were or still are employees, servants, agents or independent contractors of the aforesaid corporate entities, performing duties and services, including as supervisors, at the NCCC at the relevant times referred to in the within action. These defendants include physicians, nurses, physician's assistants and nurse practitioners. Their names are unknown or not positively known to plaintiffs but are known to the defendants. With respect to the acts and omissions set forth in this Complaint, the aforesaid defendants, including supervisory defendants, each acted under color of state law in the course of his or her duties and functions as an employee, servant, independent contractor and/or agent of Armor and/or Armor New York and as agent for the County.

54. Private physicians, nurses, physician's assistants and nurse practitioners who provide medical services to prisoners or correctional facility detainees pursuant to a contract (or sub-contract) with the municipal defendants act under color of state law. The physicians', nurses', physician's assistants' and nurse practitioners' judgments are exercised on behalf of the Armor Defendants and on behalf of the municipal defendants and in furtherance of their obligation to provide medical care to the aforesaid correctional facility inmates. The said physicians, nurses, physician's assistants and nurse practitioners perform a

governmental function and carry out the municipal defendants' constitutional obligation of providing health and medical care to the said inmates.

## NOTICE OF CLAIM

55. Plaintiffs served a Notice of Claim on the County on October 14, 2014.

56. A hearing was held pursuant to New York General Municipal Law §50(h) on April 6, 2015

57. More than thirty (30) day have elapsed since the aforesaid Notice of Claim was served on the County, and the County has failed or refused to pay or adjust the claims.

## FACTS

58. The County, the NCSD and the NCCC share a long and disturbing history of neglect of their duties, obligations and responsibilities vis-à-vis the health and medical needs and the general well-being of those who become inmates of the NCCC. The failures to provide appropriate health and medical treatment at the NCCC have been legion, and, all too often, inmates' detentions become death sentences.

59. The County, NCSD and the NCCC knew of and turned a blind eye to the pattern of manifestly deficient, unprofessional, incompetent, reckless, negligent, callous and inhumane treatment of NCCC inmates with regard to health and medical services. It appears that although advised, warned, castigated, reprimanded and ordered by various courts and state and federal entities over the years, saving dollars holds more sway than saving lives, if the lives are the lives of inmates.

60. The conditions leading to the death in custody of Gleeson are the culmination of a long history of the County, the NCSD and the NCCC failing to protect human rights, human dignity and human life.

61. If we go back to the 1980's, we find long lists of inmates' complaints about the lack of and the quality of medical services. In 1981, the then Nassau County Sheriff and the County entered into a consent judgment with inmate plaintiffs who filed suit complaining of conditions, including medical services, at the NCCC.

62. The County, NCSD and other defendants refused to comply with the terms of the consent judgment. Throughout the 1980's, NCCC inmates brought and won a series of lawsuits arising out of the County's and NCSD's failures to comply with this consent judgment. Judge Jon O. Newman, writing for the Second Circuit Court of Appeals, which found the County Sheriff in contempt of court, likened the conditions at the NCCC to a "Dickensian saga of prison overcrowding and bureaucratic excuse." *Badgley v. Santacroce,* 800 F.2d 33, 35 (2d Cir. 1986).

63. Following the well-publicized death of inmate Michael Pizzuto in 1999, the United States Department of Justice ("DOJ") opened an investigation into the conditions at the NCCC. The DOJ concluded that the conditions at the NCCC rose to the level of constitutional violations due to the deliberate indifference to inmates' serious medical needs.

64. More specifically, DOJ found that the NCCC failed to train and adequately supervise correctional staff, provided medical care by unlicensed and untrained staff, failed to ensure that inmates in need of routine or acute medical

care were seen by medical staff in a timely manner, failed to ensure that inmates with chronic diseases receive timely and appropriate follow-up treatment or medication, failed to identify, monitor and treat communicable diseases and failed to adequately manage medication and medical records.

65. In fact, in 2002, the United States Attorney for the Eastern District of New York and the United States Attorney General's Office filed a lawsuit alleging, among other claims, all of that which is set forth in paragraph "64," above. As will be set forth, *infra*, it appears that, in reality, not much has changed since the aforesaid DOJ investigation and lawsuit, at least, with regard to the health and medical care of NCCC inmates.

66. As a result of the aforesaid court action, the United States DOJ and Nassau County entered into a consent decree ("Settlement Agreement") that directed the County and the NCCC to make significant changes to its policies and practices pertaining to, among other things, medical and mental health care. As a result of the said settlement, the DOJ monitored the NCCC until 2008. (The first eight (8) pages of the Settlement Agreement and the two (2) signature pages thereof are annexed hereto, collectively, as Exhibit A, which is made a part hereof).

67. It is particularly noted that, under the settlement, the NCCC was required to cause to be developed and/or implemented appropriate medical policies, procedures and protocols (nineteen (19) were listed specifically and without limitation), ***AND***, the settlement provided, that, *"[a]t a minimum, such policies, procedures and protocols shall conform to Standards of the New York State Commission on [sic.] Correction Health Care ('NCCHC')* and the American Psychiatric

Association Standards for Psychiatric Services In Jails and Prisons. For purposes of this provision, 'essential' and important policies *shall be those described by the NCCHC.*" (Emphasis supplied; Settlement Agreement, at II(A)(7)).

68. In 2009, the New York State Commission of Correction (the entity referred to above as the "NCCHC") issued a report indicating that the NCCC was not in compliance with the minimum standards for a correctional facility. Addressing certain health and medical care needs of inmates was part of the twenty-five (25) steps that the Commission recommended that the NCCC would need to take to come into compliance with minimum standards.

69. The New York State Commission of Correction (hereinafter, "NYSCOC" or, alternatively, "Commission") is an executive branch agency established to "visit and inspect ... all institutions used for the detention of sane adults charged with or convicted of crime." (New York State Constitution, Article XVII, §5). The organization, powers and duties of the Commission are prescribed in Article 3 of the Correction Law. Among other things, the Commission is charged with "mak[ing] recommendations to administrators of correctional facilities for improving the administration of such correctional facilities and the delivery of services therein" and "promulgat[ing] rules and regulations establishing minimum standards for the review of the construction or improvement of correctional facilities and the care, custody, correction, treatment, supervision, discipline and other correctional programs for all persons confined in correctional facilities." (Correction Law §45(2), (6)). While the Commission is authorized to prescribe rules and regulations

governing correctional facilities, the Commission's authority to enforce such rules and regulations is highly circumscribed.

70. Correction Law §43 establishes a Medical Review Board within the NYSCOC. Pursuant to Correction Law §47(1)(a), the Medical Review Board is charged, *inter alia*, with investigating and reviewing "the cause and circumstances surrounding the death of any inmate of a correctional facility." Further, "[u]pon review of the cause of death and circumstances surrounding the death of any inmate, the Board shall submit its report thereon to the Commission and, where appropriate, make recommendations to prevent the recurrence of such deaths to the Commission and the administrator of the appropriate correctional facility." (§47(1)(d)). Additionally, the Medical Review Board shall "[i[nvestigate and report to the Commission on the condition of systems for delivery of medical care to inmates of correctional facilities and, where appropriate, recommend such changes as it shall deem necessary and proper to improve the quality and availability of such medical care." (§47(1)(e)).

71. In 1990, the County attempted to address some of the human rights and human life problems at the NCCC by amending the County Charter and establishing a Nassau County Correctional Center Board of Visitors (§2004). This Board of Visitors was to have wide-ranging powers to oversee operations at the NCCC, including authority to investigate inmate grievances, inspect the facility, examine records, create reports and advise the Sheriff's Department about changes that could improve the facility and prevent unnecessary deaths.

72. The County Charter's provision mandating a Board of Visitors is a non-discretionary duty of the County. County administration after administration failed to appoint the seven required Board members. In 2012, the New York Civil Liberties Union brought an action on behalf of NCCC inmates who suffered health and medical mistreatment and maltreatment while incarcerated to compel appointment of the seven Board of Visitors members. The complaints ranged from being administered incorrect doses of medication, to untreated broken bones and to never being examined by a physician despite weeks of pain and hearing loss. A State Supreme Court justice ordered the appointments of Board members in March of 2013. After much delay, upon information and belief, board members *recently* were nominated and, eventually, their appointments were confirmed by the Nassau County Legislature.

73. Upon information and belief, the aforesaid Board of Visitors has not convened to address the health and medical needs of inmates at the NCCC.

74. Since 2010, at least, nine (9) inmates whose deaths could have been prevented have perished while incarcerated at the NCCC.

75. On January 3, 2010, while incarcerated at the jail, Eamin McGinn, 32 years of age, committed suicide. The NYSCOC reported that his was "a preventable death with inadequate provision of mental and medical health care."

76. On October 5, 2010 Gasparino Godino, 31 years old, hanged himself while in detention at the NCCC. The NYSCOC found that this was a preventable death had he had proper health and medical care. Godino was a known suicide risk because of his long history of depression and drug use.

77. On October 27, 2010, 29-year old Herve Jeanot committed suicide while incarcerated at the NCCC. He had been convicted of first-degree murder at his third retrial. In its report on Jeanot's death, NYSCOC noted the NCCC "does not have any procedure in place for screening inmates who have been convicted at trial or who have received significant sentences of incarceration" for suicide risk.

78. On January 3, 2011, Darryl Woody, 44 years of age, committed suicide. The NYSCOC found that the death of Woody "may have been prevented but for the grossly inadequate psychiatric care provided him in the jail and [NUMC] and the lack of supervision ..." The NYCOC further reported that Woody had a long history of mental instability and previously had attempted suicide—once before entering the facility and, again, in December 2010, while on suicide watch at the NCCC. The Commission's report recommended investigations into the NCCC's booking, supervision and staffing procedures and into the "gross negligence and incompetence" of the two doctors who treated Woody.

79. On June 11, 2011, Roy C. Nordstrom, age 47, died of cardiac arrest. He complained of chest pains, eventually went to the infirmary and was sent back to his cell. He continued to complain of chest pain and difficulty breathing. Fellow inmates became aware of the serious distress that Nordstrom was in and shouted for guards to help Nordstrom, to no avail.

80. Nordstrom had been incarcerated for violating an order of protection and was due to be released on July 19. On June 11, at approximately 6:00 a.m., clutching his chest, and helped along by two fellow inmates, he approached a guard's station. Nordstrom was in obvious pain, distress and had difficulty

breathing. The guard called for medical care, however, no physician was contacted by anyone.

81. An unsupervised licensed practical nurse (LPN) diagnosed and treated Nordstrom, and he was sent back to his dorm. While being escorted back to his cell by a corrections officer, Nordstrom, who still had severe chest pain, fell against a wall and could not walk any further. The officer notified medical, and Nordstrom was taken back to the infirmary. At about 6:50 a.m., he again was sent back to his dorm.

82. At 7:10 a.m. Nordstrom was observed on the floor, grabbing at his chest and complaining of chest pain.

83. Eventually, at 8:05 a.m., a Nassau County Police Ambulance was dispatched and arrived at the NCCC at 8:08 a.m. Nordstrom died shortly thereafter.

84. The NYSCOC issued a final report on the Nordstrom case on September 18, 2012. Nordstrom died of myocardial infarction while in the custody of the NCCC and NCSD. The Commission, based on the investigation of the Medical Review Board, found that the death may have been prevented had Nordstrom received appropriate emergency medical care.

85. The Commission also found that Armor was grossly incompetent and in violation of NYS Education Law, Article 139 (Nursing) in that treatment of Nordstrom constituted unprofessional conduct and that the licensed practical nurse (LPN) involved acted outside his scope of practice.

86. The Commission found, too, that by returning Nordstrom to his dorm, the LPN abandoned his patient; Nordstrom, it was found, should have been

transferred to a hospital and treated by a physician. Failure to do this, the NYSCOC report set forth, constituted grossly inadequate and negligent medical care.

87. The aforesaid report found, too, that an Armor registered nurse (RN) should be investigated for "gross negligence and gross incompetence for failing to recognize that Nordstrom was critically ill, displaying obvious signs of acute coronary syndrome and keeping [him] in [a] nursing triage room ... without making notification to a physician or arranging transfer for emergency hospital level care."

88. The NYCOC report contained "Recommendations," including that the Nassau County Executive "shall conduct an inquiry into the fitness of Armor," Armor's flagrant disregard of the New York State Education Law and the Rules of the Board of Regents, Armor's nursing practices and Armor's "unlawful medical practice."

89. The NYSCOC further found that the failure to contact a physician constituted grossly inadequate medical care.

90. On February 24, 2012, Bartholomew Ryan hanged himself in his cell at the NCCC within twenty-four hours of his arrest. The 32 year-old veteran of the Iraq War had been arrested for driving under the influence of drugs and speeding. There is presently a lawsuit pending in the Eastern District of New York against the County of Nassau, the NCCC, the Sheriff's Department, Armor and various corrections officers alleging civil right violations and wrongful death.

91. Aware that Ryan had a history of mental disorders, psychiatric treatment and drug addiction, Ryan was examined by one of Armor's licensed practical nurses and, subsequently, was screened by one of its physicians.

92. Although Ryan was housed in new admission mental housing, he was not on constant supervision or suicide watch. As a result, he had opportunity to hang himself with his bed sheets.

93. The NYSCOC investigation into the death found the screening of Ryan by Armor to be inadequate.

94. According to the Commission's report, Armor was to conduct a review of its procedures for medical staff. It was also to have clinicians available during off hours. Further, Armor was to inquire into and evaluate the professional conduct of the physician who screened Ryan.

95. The Commission also recommended that the NCSD review its procedures and improve upon them. John Jaronczyk, the president of the Nassau County Sheriff Correction Officers Benevolent Association, said, in a public statement, that, "Medical was supposed to come and take over the scene ...and there was a disconnect then, but it wasn't on the officers, it was on the medical company [Armor]."

96. Kevin Brown was arrested on January 13, 2014, apparently, on an outstanding warrant for a minor crime and was incarcerated at the NCCC. On February 10, 2014, Brown, age 47, was found dead in his cell.

97. Brown's family reported that he had a history of seizures since suffering head trauma in an automobile accident 20 years ago. He took medication to control the seizures.

98. The NYSCOC, which investigated the death, found that Brown died of heart failure due to hypertensive cardiovascular disease and that his body was in

full *rigor mortis* when found, indicating that Brown had not been checked on by jail personnel for some time.

99. The NYSCOC also found that Armor's care was deficient and resulted in a mismanaged mental health diagnosis, inadequate psychiatric care, undiagnosed heart problems and inadequate management of a seizure disorder.

100. The aforesaid findings were based, in part, on Brown not being assessed by a doctor and considered for transfer to a hospital despite experiencing an earlier seizure at the NCCC and on Brown never getting a full mental health assessment despite his suffering active hallucinations and agitated behavior upon admission to the NCCC.

101. According to the NYSCOC, the aforesaid deficiencies were compounded by a health record that was unorganized, incomplete and illegible.

102. The Commission concluded that, "Had Brown received proper medical care and supervision, his death may have been prevented," and directed that Nassau County's Legislature inquire into Armor's fitness to provide inmate medical services. This directive was based on the findings in the Brown case and on what the Commission termed as Armor's *pattern of failing to provide hospitalization for patients who needed it, failing to properly manage patients' chronic medical needs and failing to keep proper and organized patient records.*

103. Armor's track record for providing health and medical services beyond Nassau County was and is not a good one, and the County and NCSD knew, or, upon exercise of due diligence, would have known that. There were scores of lawsuits pending against Armor in a number of states, including in Florida, Virginia

and Oklahoma, at the time of the contract signing; this was something that was simple and easy to check. Beyond that, news media outlets brought some of Armor's track record to public attention prior to the first contact with the County.

104. Despite this track record, the County entered into a contract, negotiated by various County officials (including input from Sposato), with Armor on May 14, 2011, and Armor took over and began performing the aforesaid services at the NCCC as of June 1. Public relations press releases by County officials touted a projected $7,000,000.00 annual savings by the County using Armor rather than continuing to hire its own medical staff and using the NUMC.

105. Perhaps, even more telling, the County (with input from Sposato) recently renewed its contract with Armor. (In fact, the contract has been renewed *twice*, in June, 2013 and June, 2015). This was in the wake of Gleeson's July, 2014 death in custody at the NCCC, and, more recently, the death of NCCC inmate Antonio Marinaccio, after he suffered cardiac arrest in April, 2015.

106. The foregoing deaths are not isolated phenomena. They are merely the more publicized (and, so, more visible) tip of the inmate medical care iceberg. Hundreds of complaints from NCCC inmates about the failure to provide needed medical and mental health services are made annually.

107. Other examples, in other jurisdictions, of Armor's pattern of reckless negligence, incompetence and shoddy practices, procedures and protocols can be found in the vast swath cut by the lawsuits filed against them. (Indeed, nonfeasance, misfeasance and malfeasance appear to be endemic with Armor). For example, Amor provides health and medical services for the Niagara County Jail in upstate

New York. Tommy Lee Jones, age 51, died on December 29, 2012, while in custody. His history of heart disease, emphysema and gout was made known to Armor. Armor's medical director gave him medication that was not advisable for someone with cardiovascular disease. At the least, the use of the medication should have been monitored; it was not. The day before his death, Jones told an Armor nurse that he felt like he was going to have a heart attack.

108. Jones died as a result of untreated acute pulmonary edema, caused by an excess of fluid build-up in his lungs. The NYSCOC found Armor to be medically negligent and recommended that state health officials investigate Armor's medical director at the correctional facility for "failing to examine and respond to a patient who demonstrated a need for immediate medical care." The Commission also found that the said medical director prescribed improper medication.

109. Daniel Pantera, age 46, was another inmate at the Niagara County Jail who died in custody. The NYSCOC found that Pantera's treatment by Armor consituted "grossly inadequate medical and mental health care" and that his death was preventable. The death, which occurred on December 25, 2012, was from hypothermia, complicated by heart disease, mental illness and other ailments—all of which previously were made known to Armor. Pantera's crime—stealing a cup of coffee from a 7-Eleven store, resulted, in effect, in a sentence of death.

110. Allen Hicks, age 51, died while incarcerated at the Hillsborough County Jail in Florida, in August of 2012. Hicks, a high school baseball coach, had been driving his car erratically and was pulled over by a highway patrol trooper. He was taken to the aforesaid correctional facility. It became apparent that the left side

of his body was not functioning. Hicks was speaking incoherently and was unable to move his left arm and left leg. It is noteworthy that Hicks did not receive a medical screening.

111. Prompt treatment for stroke is key. Armor's failure to provide potentially life-saving treatment for Hicks as he suffered the early stages of a stroke raises serious questions about the guidelines, procedures, practices and protocols of Armor, which are, according to Armor's public statements, their national standards.

112. Armor's nurses stood by as Hicks was taken to a cell and placed face down on a mattress. Within 36 hours, he was found comatose, soaked in his own urine and the victim of a massive brain hemorrhage. He died one month later.

113. To its credit, the Hillsborough County Sheriff's Office put out a press statement: "It is clear mistakes were made by Hillsborough County Sheriff's Office employees and contracted medical staff employed by Armor Correctional Health Services" in the handling of Hicks. "The Hillsborough County Sheriff's Office took immediate responsibility for its actions and accountability for its mistakes by conducting a thorough review of the entire matter and working with Hicks' family through their legal representatives to reach an amicable settlement."

114. Armor settled with Hicks' family for $800,000.00. The Hillsborough County Sheriff's Office paid an additional $200,000.00 and terminated its relationship with Armor in 2014, when their contract expired and after rejecting Armor's bid for a new contract.

115. Raleigh Priester, 52, was another victim of the medical negligence, incompetence and unprofessionalism of Armor. He was an inmate in Florida at the

Broward County Jail and had a history of schizophrenia. He was placed in solitary confinement despite his history of mental problems including time spent in a mental hospital. Priester would show outward signs of mental disturbance, including getting naked, shouting incoherently, banging his head on the floor to the point of causing his head to bleed and actively hallucinating. He was never moved to any facility for treatment.

116. Further, Priester was not given medication or medical treatment by Armor and received inadequate nutrition. As a result, in the course of approximately six months, he lost about 120 pounds of his original body weight of 240 pounds and was found dead in his cell on July 10, 2012. Armor and the Broward County Sheriff's Office recently settled the lawsuit brought by Priester's family in 2014, and the terms of the settlement are confidential.

117. It is noteworthy, however, that the Priester settlement came in close proximity to the decision by a judge of the United States District Court for the Southern District of Florida to compel Armor to turn over certain documents to the plaintiffs. It appears that, in discovery, plaintiffs sought certain mortality review findings and recommended corrective actions that were required to be made by Armor in accordance with its contract with the Broward County Sheriff's Office. Armor had objected to the plaintiff's discovery request and vigorously opposed the disclosure. However, after briefs, a hearing, argument and reargument, the court ordered Armor to turn over the documents. Upon information and belief, Armor chose to settle rather than disclose.

118. Inmates of the Tulsa County Jail sued Armor and Tulsa County Sheriff Stanley Glanz alleging inadequate medical care at the correctional facility. In one of the suits, brought by inmate Scott Birdwell, it was alleged that Birdwell's complaints of pain and his requests to be hospitalized were ignored by Armor staff. The poor treatment by and negligence of Armor, apparently, resulted in serious eye damage to the inmate. Upon information and belief, the inmates' lawsuits are still pending.

119. Women prisoners at Fluvanna Correctional Center in Virginia, a 1,200 inmate facility, brought a class action lawsuit against Armor and the Virginia Department of Corrections ("VDOC") alleging the failure, " ... on a systemic, pervasive and on-going basis," to provide constitutionally adequate health care. The suit was filed in July, 2012, and alleges that the health and medical care at the facility violates the Eight Amendment's ban on cruel and unusual punishment.

120. More specifically, the suit alleges that the female prisoners suffer pain for prolonged periods as a result of the refusal to provide adequate medical care. Some inmates, it appears, had spent months in wheelchairs because medical staff had failed to act promptly. In fact, at least, *ten deaths* at Fluvanna over the last few years, it was alleged, could have been prevented had prisoners received sufficient medical treatment. According to the suit, the problem lies with the VDOC's outsourcing to Armor (and its predecessor private health care company); the claim is that the suffering stems directly from the policies, customs and practices of Armor that puts profits over people.

121. The Fluvanna lawsuit cites, as one example, the case of prisoner Darlene White, an acknowledged diabetic. She went to the prison infirmary on

December 21, 2011, complaining of severe headache, nausea and diarrhea. A nurse gave White a shot to relieve her nausea and sent her back to her dorm. Later that day, White returned to the infirmary. A nurse checked her blood sugar and "found that it was radically elevated above normal levels." White was instructed to lie on a bed, where she remained for the next day, vomiting and defecating on herself without receiving care or a medical exam. She died shortly thereafter.

122. A second example cited in the said lawsuit involved prisoner Jeanna Wright. Beginning in 2011, she complained of severe abdominal and rectal bleeding. "For at least one year," medical staff at Fluvanna assured her that she was "fine." After finally being taken to the University of Virginia Medical Center, Wright was diagnosed with Stage IV abdominal cancer and died a few weeks later.

123. Among the examples in the Fluvanna lawsuit was one where a prisoner, after complaining about having difficulty breathing and after losing more than 40 pounds, was told by Armor's doctor that she had early stages of menopause. Almost one year later, upon finally being brought to a hospital, oncologists there determined that the inmate had sarcoidosis—a collection of nodules within the chest that could cause respiratory failure and death.

124. That same inmate also had experienced swelling in her legs. At Fluvanna, she was told by Armor staff that the swelling was from arthritis or use of birth control pills. The problem was later revealed to be a blood clot. Astonishingly, even after the above two situations became known, this inmate was not given the prescribed medication by Armor's staff.

125. The Fluvanna lawsuit cites numerous examples intended to demonstrate the inadequate and improper care that inmates receive. They often must wait months to see a doctor, and the denial of access to physicians results in the medical staff failing to examine, diagnose and treat serious medical conditions.

126. Each year, inmates at Fluvanna filed hundreds of grievances recounting the failure to provide appropriate medical care; yet, VDOC had not required Armor to adopt new practices and to improve medical care (much as is the case with the municipal defendants herein and Armor in the instant case). The Fluvanna suit claims that, by their actions and inactions, the defendants have shown deliberate indifference to the prisoners' serious medical problems and needs.

127. The lawsuit was settled in November, 2014, less than a week before the trial was to have begun. The settlement followed the court's denying defendants' motion for summary judgment and granting partial summary judgment to plaintiffs, finding that the prison had the constitutional duty to provide adequate medical care to inmates, that the inmates' complaints were "serious medical conditions" and that the defendants showed "deliberate indifference."

128. More than 10,000 people a year spend time in the NCCC awaiting trial, transfer or serving sentences for minor crimes, a stay that risks becoming a death sentence.

129. Quality of health care is being sacrificed for a population that , generally, is powerless while behind bars to seek any independent means to stay healthy.

130. The NCCC inmates are literally trapped and cannot leave the facility and, so, they are vulnerable to abuse with regard to health and medical services at the facility. This makes abuse much more intense.

131. Since Armor took over providing health and medical services at the NCCC, the number of complaints relating to medical and mental health care has escalated. Inmates have complained that doctors are no longer available seven days a week, that if someone falls ill or is injured on weekends, no treatment occurs and that Armor personnel create insurmountable barriers to inmates' access to qualified doctors by denying sick call requests and by using non-qualified medical personnel to screen people. Yet, inmates' medical complaints have little chance of being properly addressed and vented under the present policies and practices of the defendants.

132. In May, 2011, Jerry Laricchiuta, president of CSEA Local 830, the union that represented NCCC medical personnel before medical services were taken over by Armor, presciently stated his concern that turning over in-jail medical care to Armor would not improve medical and health care at the NCCC. He added, "Considering all the history here, and the suicides, and the DOJ citation, we shouldn't be looking to scale back health care, but we are."

133. The long history of the defendants' misfeasance, malfeasance and nonfeasance with regard to health and medical services at the NCCC establishes that such has become and is the policy, practice and/or custom of the municipal defendants and that such policy, practice and/or custom caused the constitutional injury to Gleeson.

134. The history Armor's misfeasance, malfeasance and nonfeasance with regard to health and medical services at the NCCC and elsewhere establishes that such has become and is the policy, practice and/or custom of Armor and that such policy, practice and/or custom caused the constitutional injury to Gleeson.

135. The United States Constitution requires governmental agencies and prison officials to provide all prisoners and pretrial detainees with adequate medical care. These individuals, by virtue of their deprivation of liberty, cannot provide such care for themselves.

136. On or about May 29, 2014, Gleeson became a detainee at the NCCC. He was charged with the crime of burglary in the third degree, relating to his allegedly taking scrap metal wire from a garage.

137. Gleeson had a 12-year history of angioedema. This condition was made known to officials at the NCCC at the outset of his incarceration. Gleeson knew, because he had been so informed by his own doctors in the past and because of his experiences during attacks, that his condition could be life-threatening if not properly attended and treated during an attack.

138. Gleeson spoke of his having made his medical condition known to NCCC personnel with various of his relatives who visited him at the NCCC and in telephone calls with them. He was concerned about getting an attack in the facility. In fact, prior to incarceration, Gleeson always had an "EpiPen" available—he kept one with him and one at home—to help deal with an onset of an attack and provide opportunity for him to reach a hospital.

139. Gleeson's mother, Margaret, visited him at the NCCC two times a week. Two of his aunts also visited Gleeson at the facility; each visited him several times. Further, Gleeson called his mother and father at their home every evening at approximately 6:30 p.m.

140. Gleeson told his mother during a visit and during telephone calls of having had an angioedema attack and going to the NCCC infirmary.

141. One of Gleeson's aunts spoke to NCCC personnel about their being aware of his angioedema condition, because during a visit, Gleeson's hands began to turn red, and there was the start of some swelling in his hands.

142. During the above-said occasion, Gleeson sought to get medical attention and went to the infirmary. He saw a member of the medical staff and was given Benadryl and steroids.

143. In his regular telephone call to his mother and father that evening, Gleeson related his visit to the infirmary that day.

144. When Gleeson suffered an attack brought on by his angioedema condition, the attacks usually would follow a pattern. First, his hands would become red and swollen, then, his arms would become red and would swell. Next, his chest would become swollen, and, finally, if the attack got that far, his neck and head would become red and swollen, and he would have difficulty breathing. All of these symptoms would become eminently noticeable even to a casual observer.

145. Gleeson (and his family) knew that once his chest started to become swollen, he had to be taken to a hospital emergency room—he would need hospital facilities to address the condition, at that point.

146. Gleeson knew very well what would happen if his attack were allowed to progress without the proper treatment. He knew that he would die slowly from asphyxiation or, even, heart failure.

147. In fact, the Nassau County Medical Examiner found the cause of death to be cardiorespiratory arrest due to laryngeal edema and angioedema.

148. Upon information and belief, Gleeson's last hours were of nightmarish horror, fright and agony, gasping for breath.

149. On July 14, 2014, at approximately 3:00 p.m., Gleeson went to medical because of the onset of an attack due to his angioedema condition. Corrections Officer "J.C." was seated at his station. Gleeson saw, presumably, one of Armor's medical personnel, and was returned to his housing unit at 3:45 p.m.

150. Gleeson's symptoms were unresolved and, in fact, were becoming worse. In distress, he complained to Correction Officers, and, upon information and belief, he was returned to medical at approximately 4:30 p.m. At this point in time, Gleeson was becoming badly swollen.

151. Upon information and belief, Gleeson requested that he be brought to a hospital emergency room.

152. Gleeson was mismedicated, that is, given the wrong medications to treat his condition each time he visited medical. These medications served as a trigger mechanism and exacerbated his condition.

153. Sometime later, he was returned to his housing unit, still in distress and still badly swollen.

154. At approximately 7:00 p.m., Gleeson's neck was swollen, reportedly, to two times normal size, and his head was swollen and turning blue. He was having difficulty breathing.

155. Gleeson called for help, to no avail.

156. By 10:00 p.m., Gleeson's neck was almost three time normal size, and he was unable to breathe.

157. Inmate witnesses said that Gleeson had been to the infirmary several times on the day of his death.

158. One inmate stated that Gleeson swelling was to shocking proportions and that he looked like a "bullfrog."

159. Another inmate witness, as Gleeson's swelling progressed during the day, said, "You saw John Gleeson, the first thing that you would, that anybody that had a brain would think, 'Why are you not in the hospital?'"

160. That same witness stated that as Gleeson's condition worsened, "There is nobody who would have looked at him and thought any different than, 'Your're going to die.'"

161. These same witnesses also stated that Gleeson told them that when he went to the infirmary, he was given Benedryl and sent away.

162. At some point, fellow inmates became more involved in the situation and began banging and shouting in an effort to get help for Gleeson.

163. At 10:16 p.m., approximately 45 minutes after the aforesaid inmates became very vocal about Gleeson needing medical help, Corrections Officer "J.C." responded to a "medical emergency."

164. At 10:40, a Nassau County Police Ambulance arrived at the NCCC.

165. Gleeson was transported to NUMC at 10:56 p.m.

166. At approximately 11:30 p.m., Margaret Gleeson answered her telephone. The person on the other end of the line stated that he was calling from the NCCC. That person asked, "Are you John Gleeson's mother?" Margaret answered, "Yes." The person continued, "I'm calling to tell you your son expired. If you want more information, call Nassau University Medical Center." The person, then, hung up, leaving Margaret in shock.

167. The next morning, inmate witnesses related, police were looking through Gleeson's cell. When police asked if anyone had information, an inmate declared, "What happened was, it was medical malpractice, and they let him die."

168. NYSCOC investigated Gleeson's death, and after its Medical Review Board completed its inquiry, issued a final report, which is dated September 15, 2015. It is signed by "Phyllis Harrison-Ross, M.D., Commissioner."

169. The fact that Dr. Phyllis Harrison-Ross is a Doctor of Medicine (and one who has practiced medicine for many years) is significant to her leading the Medical Review Board's investigation of Gleeson's medical condition, death and the practices, policies, protocols and treatment employed (or not employed) by Armor personnel.

170. The said report was recently obtained by plaintiffs' counsel and contains substantial redaction. It is addressed to "Sheriff Michael J. Sposato, Nassau County Sheriff's Office, 100 Carman Avenue, East Meadow, New York 11554" and "Cc's" the following individuals: "Bruce A. Teal, Chief Executive Officer, Armor, Inc.;

Karen Davis, Regional Vice President, Armor, Inc.; Norma L. Gonsalves, Presiding Officer, Nassau County Legislature."

171. The NYSCOC report listed numerous "Findings," and all of the findings are incorporated herein and made a part hereof. For example, the Medical Review Board and the Commission found that: "Gleeson had a history of Hereditary Angioedema that went unrecognized, misdiagnosed and improperly treated by the medical providers from Armor, Inc. *The Medical Review Board has found that Armor Inc.'s delivery of healthcare in this matter was incompetent and deficient due to a lack of adequate protocol, lack of coordination, lack of effective communication and deficient medical knowledge by physicians and midlevel clinicians.* This was compounded by a healthcare record that was unorganized, incomplete and, in selected sections, illegible. *The Medical Review Board finds that Armor Inc., in its contracted locations in New York State, has engaged in a pattern of inadequate and neglectful medical care and questions their ability to meet and provide for the healthcare needs of jail inmates.* Had John Gleeson been provided with competent medical care by Armor Inc. in a timely manner, been properly referred to a specialist, received a correct diagnosis and received proper medical treatment, his death may have been prevented." (Emphasis added).

172. The Commission also found and reported that "[t]he multiple healthcare providers documenting inconsistently and unidentifiably on multiple forms is representative of an uncoordinated patient health record system.

173. The Commission found, too, that the practices and policies of Armor "represent[ed] an uncoordinated healthcare process in obtaining community provider records."

174. The Medical Review Board found, as well, "that the medical providers of Armor Inc. at the NCCC lacked the clinical knowledge to recognize that Gleeson was symptomatic of Hereditary Angioedema and continued him on an ineffective course of treatment... Hereditary Angioedema will not respond to therapy including steroids and antihistamines and must be managed with bradykinin B2 receptor blocking agents such as icatibant. Additionally, the medical providers of Armor Inc. failed to recognize multiple trigger mechanisms for attacks of angioedema including administration of calcium channel blockers, non-steroidal anti-inflammatory drugs and aspirin."

175. The NYSCOC also set forth "Recommendations" in their final report (and they are made a part hereof), to wit: "To the Chief Executive Officer of Armor Inc. 1. Armor Inc. shall establish an organized and uniform health record for inmate health and mental health care. A review shall be conducted to assure forms are completed thoroughly, signed, dated and legible. All forms must be filed by date in clearly labeled sections and secured to the record. Armor Inc. shall assure a consistent format for all inmate records is adhered to in order for adequate review by providers in order to deliver accurate care.

2. Armor Inc. will review the health care delivery system with consideration of a system that identifies a single case manager for each inmate's care. The provider will manage chronic conditions and follow up on acute conditions seen by other

providers. This system will provide more consistent care compared to several providers seeing an inmate. *This system will minimize potential errors and gaps in health care such as those that occurred in this case.* If the facility does not have adequate physician coverage, the use of RN case managers may also be considered. (Emphasis supplied).

3. Armor Inc. shall conduct a quality assurance review of the medical care provided to Gleeson during his incarceration. Said review shall focus on:

- Why a referral to a specialist (rheumatology) was not expedited for Gleeson whose condition was undiagnosed and refractory to the medications provided?

- Why medical providers failed to diagnose Gleeson with Hereditary Angioedema, failed to recognize that prescribed medications would be ineffective, failed to obtain an accurate C1 Esterase reading, failed to initiate treatment with icatibant and failed to recognize current medications may actually be trigger mechanisms?

- Why Gleeson was not examined by a physician at his second emergent sick call on the date of the terminal event or sent immediately to a hospital emergency room?

- Why medical staff did not consider an immediate transfer to a hospital for Gleeson after repeated complaints of edema that were refractory to medical treatment(s) provided?

<u>To the Presiding Officer Nassau County Legislature</u> The Nassau County Legislature shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc.

as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's pattern of failing to properly manage patients' chronic medical needs, failing to maintain proper and organized patient records and failing to provide hospitalization for patients when clinically indicated."

176. Upon information and belief, Armor did not provide hospitalization for Gleeson (and other patients in need of hospitalization) because doing so would increase the cost of health and medical services and would not comport with budget considerations.

177. Upon information and belief, Armor did not provide medical specialist services for Gleeson (and other patients in need of such services) because doing so would increase the cost of health and medical services and would not comport with budget considerations.

178. Upon information and belief, Armor's doctors at the NCCC had to obtain direct and specific permission and authorization from Armor's corporate headquarters in Miami before the NCCC doctors could order hospitalization or testing for inmates, including for Gleeson.

179. Upon information and belief, Armor failed to follow the above set out Recommendations of the NYSCOC.

180. Upon information and belief, the Nassau County Legislature never followed the above quoted Recommendation of NYSCOC and, in fact, renewed Armor's contract and continues to use Armor's services at the NCCC despite and with utter disregard of the said Recommendations of the NYSCOC.

181. Gleeson's medical condition was a serious medical condition. He suffered sufficiently serious injury—death—as a result of the failures, deficiencies and deliberate indifference of the defendants.

182. All of the defendants herein acted with deliberate indifference with regard to Gleeson and with regard to his serious medical need.

183. The denial of appropriate medical care to Gleeson created a condition of urgency and resulted, unnecessarily, in his death.

184. The treatment of and harm to Gleeson was so egregious as to rise to the level of constitutional violation.

185. The NYSCOC, via a number of reports issued by it relating to other inmate deaths at the NCCC prior to Gleeson's death, warned the municipal defendants and Armor that they should and must address the deficiencies, failures and other problems relating to health care and medical services at the NCCC. The reports relating to the deaths in custody of inmates Roy Nordstrom and Kevin Brown, described, *supra*, are especially to be noted.

186. The municipal defendants and Armor Defendants ignored the warnings and recommendations of the NYSCOC.

187. Based on the well-known, long and repetitious history (played out in thematic rataplan) of systematic medical and health care deficiencies and failures at the NCCC, as well as an abundance of adverse media coverage and publicity in that regard (*i.e.* as to the systematically deficient health and medical care provided at the NCCC, as to Armor's track record of scores of lawsuits in multiple jurisdictions, as to Armor's pattern of medical and health service deficiencies, etc.), a number of

adverse NYSCOC reports, especially over the last five years or so, the successful lawsuits brought against the municipal defendants and Armor in the Eastern District of New York and in Nassau Supreme Court and the many hundreds of prisoner complaints, the municipal defendants and the Correction Officer defendants had actual knowledge of the deficiencies in health and medical care at the NCCC.

188. Under the circumstances extant, the municipal defendants and the Correction Officer defendants knew of the deficiencies in the medical treatment of Gleeson and/or that the state of medical and health services at the NCCC could and would lead to the deadly consequence suffered by Gleeson. They were, in fact, aware of facts from which the inference could be drawn that a substantial risk of serious injury or harm existed with regard to Gleeson.

189. Similarly, Armor had knowledge of all that is set out in paragraphs "187" and "188," above.

190. The defendants further exhibited deliberate indifference by ignoring past sanctions imposed by courts and the DOJ, by allowing the systematic deficiencies of health and medical care at the NCCC to "fester" for decades, by ignoring reports of the NYSCOC issued prior to that entity's report on Gleeson, by ignoring Gleeson's obvious condition, by failing to provide treatment for a diagnosed or known condition, by failing to investigate to make an informed judgment, by delaying treatment of Gleeson, by delaying hospitalization of Gleeson, by making medical decisions based on non-medical factors (for example, financial considerations, expediency, lack of staff, etc.), in interfering with access to medical treatment (by giving priority to financial considerations rather than the welfare of

an inmate, by denying Gleeson access to a medical specialist, etc.), by making a medical judgment as to Gleeson that was so deficient and incompetent that it is not "medical," and, as to the municipal defendants only, by hiring Armor without doing proper due diligence and, further, by renewing Armor's contract under and in light of all of the circumstances extant.

191. The acts and omissions of the municipal defendants and their repeated conduct, was so persistent and widespread, as has been set out hereinabove, as to constitute policies, customs and practices that proximately caused the constitutional injury to Gleeson.

192. The Fourteenth Amendment's due process clause governs the right of pre-trial detainees such as Gleeson not to be subjected to cruel or unusual punishment just as the Eighth Amendment governs the rights of convicted prisoners in this regard. The same legal standard that governs conditions-of-confinement claims under the Eighth Amendment is applicable to such claims under the Fourteenth Amendment.

193. Armor and its private doctors and medical personnel, as a consequence of Armor's contract with the County to provide health and medical services to the inmates of the NCCC, and, therefore, performing governmental functions, is subject to §1983 claims relating to the adequacy of the medical and health services provided.

194. NCCC officials knew that Gleeson faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it.

195. The defendant Sposato and the various Correction Officer defendants (some of whom were supervisors), through their own individual actions, violated Gleeson's constitutional rights.

196. Sposato, as a supervisory official, participated directly in the constitutional violations. As Sheriff and chief administrator and supervisor of the NCCC, he promulgated, created or participated in the creation of the policies, practices and customs under which the unconstitutional conduct occurred and/or he allowed the continuance of such policy, practice and custom.

197. Defendant Sposato knew and/or it was obvious that continuing the above-said policies, practices and customs posed an excessive risk to the health and safety of inmates like Gleeson.

198. Defendant Sposato, through his continued encouragement, approval and ratification of the aforementioned policies, practices and customs, despite their known and obvious inadequacies and danger and risks to inmates, was deliberately indifferent to inmates,' including Gleeson's, serious medical needs.

199. The municipal defendants (including Sposato) failed to adequately train and supervise the staff of the NCCC. This constituted deliberate indifference to the rights of those who would come into contact with the said staff, including Gleeson.

200. Armor failed to adequately train and supervise its medical staff, which staff performed health and medical care services at the NCCC. This constituted deliberate indifference to the rights of those inmates who came into contact with the said staff, including Gleeson.

201. The municipal defendants endorsed, accepted and adopted the policies, practices and protocols of Armor, and the conduct, acts and failures to act in pursuance of these policies caused the violation of Gleeson's constitutional rights.

202. In twice renewing Armor's contract, the municipal defendants repeatedly ratified the policies, practices and protocols of Armor, when, in fact, they should have taken affirmative action to terminate the existing contract or to refuse renewal.

203. As recently as May, 2015, prior to the last renewal, NCSD spokesman, Captain Michael Golio, in response to an inquiry, publically averred, "There is no intention of discontinuing the existing relationship [with Armor] at this time."

204. The municipal defendants created the risk of violating Gleeson's constitutional rights by creating conditions, policies, customs and practices as those set out hereinabove.

205. Armor created the risk of violating Gleeson's constitutional rights by creating conditions, policies, customs and practices as those set out hereinabove.

206. Gleeson's death was not the last inmate death due to the deficient medical care and treatment at the NCCC. Antonio Marinaccio, Jr., age 53, became "brain dead" after suffering a heart attack in jail in May, 2015.

207. Marinaccio, it appears, earlier had provided medical staff at the NCCC with medical records that showed he had a pre-existing heart condition.

208. Apparently, Armor failed to perform an EKG of Marinaccio after he complained of severe chest pains. He was returned to his cell from the infirmary

and was later found face down and unconscious. He never regained consciousness, and, eventually, was taken off life-support.

209. The Notice of Claim filed on behalf of the family of Marinaccio against the municipal defendants herein and Armor, alleges that Marinaccio was the victim of wrongful death, abuse, gross misconduct and medical negligence.

**LEGAL CLAIMS FOR RELIEF- FEDERAL**

**FIRST CLAIM**

210. Plaintiffs repeat, reallege and incorporate by reference paragraphs "1" through "209," above, as if more fully set forth herein.

211. The defendant County, acting on its own and through the NCSD, the NCCC, Sheriff Sposato and the Armor Defendants, directly caused the constitutional violations suffered by Gleeson as a result of the pattern of conduct alleged herein of Sheriff Sposato, Corrections Officers John Does 1 through 10, the Armor Defendants and the Armor Defendants' employees and agents, John and Jane Does 11 through 20, and is liable for damages suffered by the plaintiffs herein.

212. At all times relevant herein, defendant County, acting on its own and through the NCSD, NCCC, Sheriff Sposato and the Armor Defendants had in effect certain policies, practices and customs that created, caused, condoned, contributed to, allowed and fostered the unconstitutional conduct of the other municipal defendants, the Armor Defendants and the said individual correction officers and the said employees and agents of the Armor Defendants.

213. At all times relevant herein, defendant County, acting on its own and through the NCSD, NCCC, the Armor Defendants and the aforesaid individual

defendants, had in effect certain policies, practices and customs which overlooked and ignored, encouraged and explicitly and/or tacitly sanctioned, through the conduct alleged herein, the violation of Gleeson's and other inmate's constitutional rights to adequate health and medical care at the NCCC.

214. The aforesaid policies, practices and customs were the direct and proximate cause of the unconstitutional conduct alleged herein as to Gleeson and other NCCC inmates.

215. The defendant County knew of the deficiencies of health and medical services of the NCSD, the NCCC, the Armor Defendants and the aforesaid individual defendants prior to July 14, 2014, the date of Gleeson's death.

216. Despite its knowledge and awareness, as aforesaid, the defendant County allowed this wrongful and unconstitutional conduct and failed to take appropriate remedial action.

217. The defendant County knew of the Armor's propensity for performing deficient health and medical services on behalf of inmates.

218. By renewing Armor's contract, the defendant County ratified and condoned Armor's policy, practice and/or custom of Armor's deficient health and medical care services.

219. Despite its knowledge of the aforesaid propensity of Armor, the defendant County failed to take appropriate remedial action.

220. The defendant County's conduct demonstrated reckless and/or callous indifference to the federally protected rights of Gleeson.

221. All of the foregoing led to the violation of Gleeson's constitutional rights and his untimely and unnecessary death.

**SECOND CLAIM**

222. Plaintiffs repeat, reallege and incorporate by reference paragraphs "1" through "221," above, as if more fully set forth herein.

223. The defendant County, acting on its own and through the other municipal defendants failed to train or to adequately train the defendant Corrections Officers John Does 1 through 10, other NCSD staff and medical staff at the NCCC.

224. The defendant County, acting on its own and through the other municipal defendants failed to train or to adequately train the Armor defendants, and their employees and agents, John and Jane Does 11 through 20.

225. The need for training, additional training or different training to avoid violation of constitutional rights was such as to be obvious that the inadequacy of training would result in a violation of Gleeson's and other inmates' constitutional rights relating to their serious medical needs and other aspects of health and medical care.

226. The inadequacy of training as aforesaid at the NCCC was so pervasive and long-standing as to form a pattern constituting deliberate indifference to the serious medical needs of Gleeson and other inmates and established the deficient and inappropriate training as policy, practice and/or custom.

227. The pattern of similar constitutional violations by untrained or inadequately trained NCCC staff (including medical staff of Armor) demonstrate the

deliberate indifference of the County toward its failure to adequately train NCCC staff.

228. As a result of all that is set out above, the defendant County had sufficient notice of the failure to adequately train.

229. Despite the said sufficient notice, the defendant County failed to take appropriate remedial action.

230. It is and was reasonable for plaintiffs, Gleeson and other NCCC inmates to expect adequate training to have occurred.

231. The defendant County's conduct demonstrated reckless and/or callous indifference to the federally protected rights of Gleeson.

232. All of the foregoing led to the violation of Gleeson's constitutional rights and his untimely and unnecessary death.

**THIRD CLAIM**

233. Plaintiffs repeat, reallege and incorporate by reference paragraphs "1" through "232," above, as if more fully set forth herein.

234. The defendant County, acting on its own and through the other municipal defendants failed to supervise or to adequately supervise the defendant Sposato, the defendant Corrections Officers John Does 1 through 10, other NCSD staff and medical staff of the NCCC, including John and Jane Does 11 through 20.

235. Defendant County employee supervisors, in the County government's executive branch, participated directly in the unconstitutional actions of the defendants by promulgating, creating, condoning, implementing, directing, adopting as their own and carrying out or continuing certain policies, practices and customs

that violated Gleeson's and other inmates' constitutional rights, as alleged hereinabove.

236. Defendant Sposato, as a supervisor and administrator, participated directly in the unconstitutional actions of the defendants by promulgating, creating, condoning, implementing, directing, adopting as his own and carrying out certain or continuing policies, practices and customs that violated Gleeson's and other inmates' constitutional rights, as alleged hereinabove.

237. The aforesaid defendant supervisors (See, paragraphs "235" and "236") were deliberately indifferent with regard to their supervision of others, including other defendants.

238. The aforesaid defendant supervisors had knowledge of the inadequacies of their supervision and failed to do anything to remedy the situation that existed.

239. The aforesaid supervisors caused Gleeson to be subjected to the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States.

240. The conduct of the defendant County and the aforesaid supervisors demonstrated reckless and/or callous indifference to the federally protected rights of Gleeson.

241. The defendant County's and the aforesaid supervisors' failures to adequately supervise, as set forth, led to the violation of Gleeson's constitutional rights and his untimely and unnecessary death.

**FOURTH CLAIM**

242. Plaintiffs repeat, reallege and incorporate by reference paragraphs "1" through "241," above, as if more fully set forth herein.

243. The Armor Defendants failed to train or to adequately train the medical staff at the NCCC, including defendants John and Jane Does 11 through 20 and, further, failed to train or adequately train defendant Corrections Officers John Does 1 through 10.

244. The need for training, additional training or different training to avoid violation of constitutional rights was such as to be obvious that the inadequacy of training would result in a violation of Gleeson's and other inmates' constitutional rights relating to serious medical needs and other aspects of health and medical care.

245. The inadequacy of training given by the Armor Defendants to medical staff and corrections officers at the NCCC was so pervasive and long-standing as to form a pattern constituting deliberate indifference to the serious medical needs of Gleeson and other inmates and established the deficient and inappropriate training as policy, practice and/or custom of the Armor Defendants.

246. The pattern of similar constitutional violations by untrained or inadequately trained NCCC medical staff and corrections officers demonstrates the deliberate indifference of the Armor Defendants toward their failure to adequately train the aforesaid NCCC staff.

247. As a result of all that is set out above, the Armor Defendants had sufficient notice of the failure to adequately train.

248. Despite the said sufficient notice, the Armor Defendants failed to take appropriate remedial action.

249. It is and was reasonable for plaintiffs, Gleeson and other NCCC inmates to expect adequate training to have occurred.

250. The Armor Defendants' conduct demonstrated reckless and/or callous indifference to the federally protected rights of Gleeson.

251. All of the foregoing led to the violation of Gleeson's constitutional rights and his untimely and unnecessary death.

**FIFTH CLAIM**

252. Plaintiffs repeat, reallege and incorporate by reference paragraphs "1" through "251," above, as if more fully set forth herein.

253. The Armor Defendants failed to supervise or to adequately supervise the defendant medical staff of the NCCC, including defendants John and Jane Does 11 through 20 and, further, failed to train or adequately train defendant Corrections Officers John Does 1 through 10.

254. Supervisors and administrators employed by the Armor Defendants participated directly in the unconstitutional actions of other defendants by promulgating, creating, condoning, implementing, directing, adopting as their own and carrying out or continuing certain policies, practices and customs that violated Gleeson's and other inmates' constitutional rights, as alleged hereinabove.

255. The aforesaid defendant supervisors and administrators were deliberately indifferent with regard to their supervision of others, including other defendants.

256. The aforesaid defendant supervisors and administrators had knowledge of the inadequacies of their supervision and failed to do anything to remedy the situation that existed.

257. The aforesaid supervisors caused Gleeson to be subjected to the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States.

258. The conduct of the Armor Defendants and the aforesaid supervisors and administrators demonstrated reckless and/or callous indifference to the federally protected rights of Gleeson.

259. The Armor Defendants' supervisors' and administrators' failures to adequately supervise, as set forth, led to the violation of Gleeson's constitutional rights and to his untimely and unnecessary death.

**SIXTH CLAIM**

260. Plaintiffs repeat, reallege and incorporate by reference paragraphs "1" through "259," above, as if more fully set forth herein.

261. The defendants had an affirmative duty to provide and administer health and medical services to Gleeson and other NCCC inmates.

262. The defendants, as previously alleged, had a duty and obligation to Gleeson and other inmates of the NCCC to provide reasonable and adequate health and medical services.

263. The defendants had knowledge that the health care they provided and/or were responsible for providing to Gleeson and other inmates of the NCCC was deficient, inadequate and incompetent.

264. The health and medical care provided by defendants, or which they were responsible for providing, to Gleeson failed to meet an acceptable standard of treatment and care in terms of modern medicine, technology and current beliefs about human decency.

265. The health and medical care provided by the defendants, or which they were responsible for providing, created an excessive risk to Gleeson, and the harm to which Gleeson was exposed was sufficiently serious as to implicate his constitutional rights.

266. The defendants knew that Gleeson's medical condition constituted a serious need for competent and adequate medical care and treatment.

267. The defendants knew of and ignored the aforesaid excessive risk to Gleeson's health.

268. The denial of adequate medical care as aforesaid created a condition of urgency, where pain, emotional distress, disability, permanent injury or death was likely.

269. The defendants' policies, practices, customs, actions and failures to act constituted deliberate indifference to the serious medical needs of Gleeson.

270. As a direct and proximate result of the foregoing, Gleeson was subjected to great physical and emotional pain and suffering.

271. The defendants' conduct demonstrated reckless and/or callous indifference to the federally protected rights of Gleeson.

272. As a direct and proximate result of the foregoing, Gleeson was subjected to cruel and unusual punishment.

273. As a direct and proximate result of all of the foregoing, as alleged hereinabove, Gleeson's rights under the Fourteenth Amendment[1] of the United States Constitution were violated, which violations resulted in his death.

**SEVENTH CLAIM**

274. Plaintiffs repeat, reallege and incorporate by reference paragraphs "1" through "273," above, as if more fully set forth herein.

275. The Armor Defendants were under contact with the defendant County to provide constitutionally adequate health and medical care services for the inmates of the NCCC.

276. The Armor Defendants, including their doctors and nurses, some of whom are defendants John and Jane Does 11through 20, made numerous mistakes in the care and treatment of Gleeson.

277. The Armor Defendants, including their doctors and nurses, some of whom are defendants John and Jane Does 11 through 20, were negligent in the care and treatment of Gleeson.

278. The Armor Defendants, including their doctors and nurses, some of whom are defendants John and Jane Does 11 through 20, failed to provide constitutionally adequate health and medical care to Gleeson.

[1] It is noted that the Eight Amendment is applicable to convicted prisoners while a detainee's right not to be subjected to cruel or unusual punishment is protected by the Fourteenth Amendment. *See, United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999), citing *Graham v. Connor*, 490 U.S. 386, 392, n. 6 (1989). The same legal standard governs conditions-of-confinement cases brought under the Eighth and Fourteenth Amendments. *See, Caiozzo v. Koreman*, 581 F.3d 63, 71 and n. 4 (2d Cir. 2009).

279. As a direct and proximate result of the foregoing, Gleeson was subjected to great physical and emotional pain and suffering.

280. The conduct of the Armor Defendants, including the aforesaid doctors and nurses, demonstrated reckless and/or callous indifference to the federally protected rights of Gleeson.

281. All of the foregoing led to the violation of Gleeson's constitutional rights and his untimely and unnecessary death.

**EIGHTH CLAIM**

282. Plaintiffs repeat, reallege and incorporate by reference paragraphs "1" through "281," above, as if more fully set forth herein.

283. Unknown corrections officers, designated herein as Corrections Officers John Does 1 through 10, were deliberately indifferent to the serious medical needs of Gleeson.

284. These serious medical needs were known by and/or obvious to the said corrections officers.

285. These defendant corrections officers delayed Gleeson's receiving medical care and treatment for his angioedema condition on occasions prior to the occasion which led to his death on July 14, 2014.

286. These corrections officer defendants failed to keep watch or monitor Gleeson's condition on July 14, 2014, as it became progressively worse.

287. On July 14, 2014, these defendant corrections officers wasted valuable time in getting Gleeson the emergency medical care and treatment that he obviously

needed after suffering an angioedema attack and, especially, after he became grossly swollen, had difficulty breathing and was in obvious distress.

288. These corrections officer defendants ignored the shouts and calls of fellow inmates to come to the aid of Gleeson.

289. As a direct and proximate result of the deliberate indifference of the said corrections officer defendants, Gleeson suffered unnecessary, prolonged and exacerbated mental and physical pain and suffering.

290. As a direct and proximate result of the deliberate indifference of the corrections officer defendants, Gleeson's chances of surviving the angioedema attack were severely diminished.

291. The defendant corrections officers' conduct demonstrated reckless and/or callous indifference to the federally protected rights of Gleeson.

292. All of the foregoing led to the violation of Gleeson's constitutional rights and his untimely and unnecessary death.

## NINTH CLAIM

293. Plaintiffs repeat, reallege and incorporate by reference paragraphs "1" through "292," above, as if more fully set forth herein.

294. The purpose and policies underlying 42 United States Code §1983 are compensation for those whose constitutional rights are violated as a result of actions taken under color of state law and deterrence by punishing those who have caused the constitutional violations.

295. New York law regarding wrongful death and survival actions and recoverable damages is inconsistent with the purpose and policies of §1983, in that such state statutes would bar or limit available remedies under §1983.

296. As set forth hereinabove, defendants' wrongful conduct, policies, customs and practices with regard to health and medical services at the NCCC were the direct and proximate cause of Gleeson's death.

297. As a direct and proximate result of the aforesaid wrongful conduct, policies, customs and practices, Gleeson was deprived of his enjoyment of life.

298. As a direct and proximate result of the aforesaid wrongful conduct, policies, customs and practices, Gleeson suffered great physical pain, severe emotional distress, terror and mental anguish and loss of health prior to his death.

299. As a direct and proximate result of the aforesaid wrongful conduct, policies, customs and practices, Gleeson suffered the illegal deprivation of his constitutional entitlements.

300. The defendants' conduct demonstrated reckless and/or callous indifference to the federally protected rights of Gleeson.

301. All of the foregoing led to the violation of Gleeson's constitutional rights and his untimely and unnecessary death.

## LEGAL CLAIMS FOR RELIEF – STATE

## TENTH CLAIM

302. Plaintiffs repeat, reallege and incorporate by reference paragraphs "1" through "301," above, as if more fully set forth herein.

303. By reason of all that is set forth hereinabove, including the wrongful conduct, acts and omissions of the defendants, Gleeson sustained severe bodily injury resulting in his death on July 14, 2014.

304. Gleeson is survived by his next of kin and distributees.

305. As a result of the wrongful death of Gleeson, his next of kin and distributees lost his services, companionship, support, parental care, physical, moral and intellectual guidance, income and expected inheritance.

306. Gleeson's estate is entitled to receive compensation for his pain and suffering.

307. As a result of the foregoing wrongful death of Gleeson, his estate became liable for and expended sums of money for funeral, burial and other expenses.

308. As a result of the foregoing wrongful death of Gleeson, his next of kin and distributes suffered pecuniary loss as defined in the laws of the State of New York, including the New York Estates, Powers and Trust Law.

309. The wrongful conduct, acts, omissions, policies, customs and practices of the defendants, as described hereinabove, were so egregious as to entitle Gleeson's estate to punitive damages.

**ELEVENTH CLAIM**

310. Plaintiffs repeat, reallege and incorporate by reference paragraphs "1" through "309," above, as if more fully set forth herein.

311. The municipal defendants and the Armor Defendants are vicariously liable for the acts of their employees and/or agents under the doctrine of *respondeat superior*.

312. The municipal defendants and the Armor Defendants, through their employees and/or agents owed a duty to Gleeson and all other inmates incarcerated at the NCCC, to tender medical care and treatment with reasonable care and not to cause additional harm during the course of that care and treatment.

313. Defendants John and Jane Does 11 through 20 are physicians, nurses and other medical personnel who are employees and/or agents of the Armor Defendants and agents of the defendant County and whose identities are unknown to plaintiffs at this time, but whose identities are known to the defendants herein.

314. During his incarceration at the NCCC, Gleeson was seen, treated by or had consulted with various of the unknown defendant doctors and nurses.

315. The Armor Defendants held themselves out to be providers of professional, competent and skilled health and medical care services.

316. Upon information and belief, at all times material herein certain defendants John and Jane Does 11 through 20 held themselves out to be physicians, nurses and other medical personnel licensed to practice in the State of New York and/or elsewhere.

317. John or Jane Doe physicians held themselves out to be competent to diagnose, treat, prescribe medications for and otherwise tend to inmates of the NCCC like Gleeson.

318. During Gleeson's incarceration at the NCCC, certain of the aforesaid defendant physicians, nurses and other licensed medical personnel treated Gleeson in a medically negligent manner or failed to treat him, including on the date of his death.

319. The defendants John and Jane Does 11 through 20, individually, and/or jointly and severally, carelessly and negligently failed to diagnose and/or misdiagnosed Gleeson's serious medical condition.

320. The defendants John and Jane Does 11 through 20, individually, and/or jointly and severally, carelessly and negligently rendered medical care and treatment to Gleeson, which care and treatment was not in accordance with good and accepted medical practice.

321. The defendants John and Jane Does 11 through 20, individually, and/or jointly and severally, carelessly and negligently rendered improper medical care and treatment to Gleeson while he was incarcerated at the NCCC.

322. The defendants John and Jane Does 11 through 20, individually, and/or jointly and severally, carelessly and negligently failed to care for and medically treat Gleeson.

323. The aforesaid unknown attending defendant physicians and nurses individually and/or jointly and severally, failed to provide adequate or timely evaluation and treatment of Gleeson's known condition prior to the date of his death.

324. The defendants John and Jane Does 11 through 20, individually, and/or jointly and severally, carelessly and negligently failed to adequately prescribe appropriate medications to treat Gleeson's medical condition.

325. The defendants John and Jane Does 11 through 20, individually, and/or jointly and severally, carelessly and negligently failed to foresee a problem with the particular course of treatment administered to Gleeson.

326. The defendants John and Jane Does 11 through 20, individually, and/or jointly and severally, carelessly and negligently failed to monitor Gleeson during his stay at the NCCC and, especially, on July 14, 2014.

327. The aforesaid unknown attending defendant physicians and nurses, individually and/or jointly and severally, failed to provide adequate or timely evaluation and treatment on the date of his death, even as Gleeson's condition obviously deteriorated and as he specifically requested medical attention while in custody at the NCCC.

328. The aforesaid unknown attending defendant physicians and nurses, individually, and/or jointly and severally, prevented Gleeson's timely transfer to a medical facility for appropriate medical care and treatment.

329. By reason of the above, Gleeson was caused to sustain severe and irreparable injury and great physical and mental pain and suffering before his death.

330. Defendants' medical negligence was a direct and proximate cause of Gleeson's death.

## TWELVETH CLAIM

331. Plaintiffs repeat, reallege and incorporate by reference paragraphs "1" through "330," above, as if more fully set forth herein.

332. The foregoing conduct, acts, omissions, policies, customs and practices, as set forth in detail hereinabove, undertaken with such callousness, recklessness, deliberate indifference, wanton willfulness and utter disregard for human sensitivities and rights, constitutes extreme and outrageous conduct that is so egregious as to exceed the bounds of civilized behavior and shocks the conscience.

333. The foregoing, as set forth above, was substantially certain to cause, and did cause, the plaintiffs herein to suffer extreme and enduring mental anguish, shock, degradation and enduring physical pain, which was and is the direct result of defendants' intentional infliction of emotional distress.

## JURY TRIAL DEMANDED

334. Plaintiffs demand a trial by jury on each and every claim for relief set forth herein.

**WHEREFORE,** plaintiffs demand the following relief jointly and severally against all of the defendants, as follows:

a. Awarding compensatory damages as to all claims for relief, except the Tenth Claim, in an amount to be determined by a jury;

b. Awarding punitive damages as to all claims for relief in an amount to be determined by a jury;

c. As to the Tenth Claim, awarding pecuniary damages and other relief in accordance with the NYEPTL;

d. Awarding costs, including reasonable attorney's fees;

e. Declaring that the findings of the final NYSCOC report relating to its investigation of Gleeson's death are valid and that the said findings be held to be binding upon the municipal defendants and the Armor Defendants;

f. Directing that the municipal defendants and the Armor Defendants follow the Recommendations of the NYSCOC as set forth in its final report relating to its investigation of Gleeson's death;

g. Enjoining the defendant County from entering into any contact with any private entity to provide health and medical services at the NCCC without first putting such contract out to open bid and without first exercising appropriate due diligence in the selection of the service provider; and

h. Awarding such other and further relief as this Court may deem just and proper.

Dated: Mineola, New York
November 5, 2015

THE PASCARELLA LAW FIRM PLLC

By: ______________________
JAMES A. PASCARELLA (JP4952)
Attorneys for Plaintiffs

1551 Franklin Avenue
Mineola New York 11501
Tel. No. (516) 742-1134
Fax No. (516) 742-1134; 742-1137
Email: Pascarellaw@optonline.net;
jamesapascarella@pascarellalawfirm.com

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, Plaintiff,

-against-

NASSAU COUNTY, THOMAS GULOTTA, Nassau County Executive, NASSAU COUNTY SHERIFF'S DEPARTMENT, and EDWARD REILLY, Sheriff of Nassau County, Defendants.

## SETTLEMENT AGREEMENT

### I. Introduction

1. On April 19, 1999, the United States, through the Department of Justice ("DOJ") notified Nassau County Executive Thomas Gulotta of its intent to investigate certain conditions at the Nassau County Correctional Center ("NCCC") to determine whether those conditions violated inmates' constitutional rights. The United States conducted this investigation pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. §§ 1997 *et seq.*, and the pattern or practice provision of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141.

2. On September 11, 2000, DOJ issued its letter of findings ("Findings Letter") containing evidence that NCCC subjects inmates to unconstitutional conditions that have caused them grievous harm: that staff engage in a pattern or practice of physical abuse of inmates, and that NCCC is deliberately indifferent to inmates' serious medical needs.

3. NCCC cooperated throughout the course of the investigation and indicated a willingness to voluntarily undertake measures to improve conditions at NCCC and to respond to the evidence set forth in DOJ's Findings Letter and to address DOJ's concerns regarding treatment of inmates' serious mental health needs set forth in a letter dated October 4, 2000. Consequently, the parties enter into this Settlement Agreement for the purpose of avoiding the risks and burdens of litigation.

4. The parties agree that this settlement does not constitute an admission by the defendants of the truth of the findings contained in the Findings Letter and does not constitute an admission of liability by the defendants. This settlement is not intended to interfere with rights conferred by any applicable collective bargaining agreements or alter any existing collective bargaining agreements.

5. The parties acknowledge that the Nassau University Medical Center ("NUMC") provides medical care to inmates at the NCCC and that such care is provided pursuant to a contract with the NUMC which sets forth the terms and conditions of the relationship between the County of Nassau and its agencies and NUMC. Nassau County shall be responsible for ensuring that NUMC complies with the terms of this agreement. Nothing in this paragraph shall abrogate Nassau County's responsibility to comply fully with the terms of this agreement.

6. It is expressly understood and acknowledged that, while this agreement makes no distinctions between those issues concerning inmate care, custody and control previously modified and or improved prior to the issuance of the Findings Letter and those which shall be modified and/or improved by virtue of the terms of this agreement, the parties acknowledge that a number of the policies and/or procedures which this agreement addresses were implemented or in the process of being implemented prior to the issuance of the Findings Letter.

## II. Medical and Mental Health Care

### A. Policies and Procedures

7. NCCC shall cause to be developed and/or implemented appropriate written medical policies, procedures, and protocols that include, but are not limited to the following: (1) initial inmate screening and inmate health assessments; (2) staffing levels, necessary credentials and job descriptions; (3) sick call and other access to medical services; (4) distribution and management of medications; (5) emergency care; (6) dental care; (7) mental health care; (8) substance abuse treatment; (9) treatment of individuals with special needs; (10) communicable disease testing and control; (11) women's health care; (12) routine and chronic disease care; (13) medical records; (14) staff training; (15) quality assurance; (16) mortality reviews; (17) inmate education; (18) medical safety and sanitation; (19) suicide prevention; (20) immunization; and (21) medical grievance procedures. At a minimum, such policies, procedures and protocols shall conform to Standards of the New York State Commission on Correction ("NYSCOC"), all "essential" and 85% of the "important" policies of the National Commission on Correctional Health Care ("NCCHC") and the American Psychiatric Association Standards for Psychiatric Services in Jail and Prisons. For purposes of this provision, "essential" and "important" policies shall be those so described by the NCCHC.

### B. Medical Staffing and Professional Credentials

8. All persons providing medical, dental or mental health treatment ("medical staff") shall have written job descriptions and shall meet applicable state licensure and/or certification requirements. For purposes of this agreement, medical staff shall be defined as physicians and "allied health professionals." For purposes of this agreement, "allied health professional" shall be defined only as a licensed physician assistant or licensed nurse practitioner. "Clinical staff" shall be defined as nursing staff and medical staff.

9. All security personnel shall be trained to provide first response assistance in an emergency situation (i.e., CPR, bag valve resuscitation and/or to address serious bleeding.) Security personnel and Emergency Technicians ("EMTs") and Advanced Medical Technicians ("AMTs") shall not provide medical, dental or mental health, evaluation, diagnosis, or treatment, other than as first line emergency medical response. Security personnel may assist a physician or allied health professional in emergencies. Emergencies shall not include situations in which non-emergent medical, dental or mental health care treatment is necessary or is being provided, and medical staff is unavailable to provide such treatment.

10. NCCC shall make reasonable efforts to ensure an inmate's privacy subject to legitimate security concerns and emergency situations.

11. The medical director of the NCCC shall be a qualified, licensed physician. Qualified, licensed physicians shall supervise inmate medical and mental health treatment, and medical policy development. The medical director of the NCCC shall have ultimate responsibility for supervising all medical and clinical staff, although nursing personnel may be responsible for intermediate levels of supervision over such staff. The medical director's office shall be situated in the medical unit of the NCCC. The medical director shall routinely and regularly provide on-site supervision of medical staff. The medical director may also maintain an office at the NUMC.

12. NCCC shall cause its medical provider to verify medical credentials for all medical professionals upon initial hire, and at least every two years thereafter. The verification shall include inquiry into any restrictions or sanctions for each health professional who provides medical care to patients. NUMC shall maintain copies of current professional credential licensing for all medical and mental health professionals, and maintain appropriate records of its credential verifications. NUMC shall make such records available to DOJ upon request.

13. NCCC shall provide twenty-four (24) hour on site full-time physician or allied health professional coverage (under the supervision of a physician) seven (7) days per week, fifty-two (52) weeks per year.

NCCC shall provide daily nursing coverage from six (6) a.m. to ten (10) p.m. NCCC shall provide a minimum of forty (40) hours of on site physician coverage (available to see patients) per week, and shall also provide and maintain twenty-four (24) hour daily on-call physician coverage. Staffing levels shall be sufficient to provide adequate treatment of inmates' serious medical needs.

14. NCCC shall ensure that NUMC retains psychiatrists and psychiatric social workers at staffing levels sufficient to provide adequate treatment of inmates' serious mental health needs.

15. NCCC shall ensure that NUMC maintains monthly reports setting forth all medical staffing positions filled and unfilled on the first day of each reporting period. This report shall include all personnel/professional job classifications, as defined above.

**C. Intake Screening**

16. NCCC shall perform timely initial health screening for new inmates on the day of arrival in accordance with 22 N.Y.C.R.R. § 7010.2 and shall make every good faith effort to record and seek the inmates' cooperation to provide (1) medical, surgical, mental health, and dental history; (2) current injuries, illnesses, evidence of trauma, and vital signs; (3) current medications; (4) allergy information; (5) personal physician(s), dentist(s), and mental health provider(s); (6) immunization history as follows: influenza; pneumococcal vaccine for inmates fifty (50) or over or with chronic disease; hepatitis; (7) mental health screening to include suicide attempt history, history of mental health including hospitalization, suicidal ideation and risk assessment; (8) history of substance abuse and treatment; (9) pregnancy; (10) history or symptoms of tuberculosis, including the date and result of the last TB test; (11) history or symptoms of other communicable diseases. All medical and mental health screening forms shall become part of an inmate's medical record or chart.

17. As part of intake screening, NCCC shall routinely perform on all inmates a tuberculin skin test (i.e. Mantoux "PPD") and shall read the PPD forty-eight (48) to seventy-two (72) hours after placement unless such test is unnecessary (i.e. history of prior positive tests) or medically contra-indicated according to Centers for Disease Control ("CDC") Guidelines. Within 72 hours of determining that an inmate's PPD test is positive, NCCC shall perform and interpret a chest x-ray of the inmate. NCCC shall follow CDC guidelines for management of inmates with TB infection, including prophylactic medication for any patient with an anticipated length of stay of two (2) months or more. Inmates who refuse a TB test shall be placed in segregation.

18. As part of intake screening, NCCC shall routinely screen women inmates for gonorrhea and chlamydia within twenty-four (24) hours of admission, Monday through Friday and within forty-eight (48) hours if the inmate is admitted to NCCC on Saturday or Sunday. NCCC shall provide medically appropriate treatment within ninety-six (96) hours of testing. Screening shall consist of a urine screening test or bacterial culture test.

19. As part of intake screening, NCCC shall routinely administer to all inmates a blood test for syphilis and shall provide medically appropriate treatment within ninety-six (96) hours of testing.

20. Pneumococcal and influenza vaccinations shall be provided to inmates in accordance with CDC guidelines, unless NCCC's physician deems such vaccinations medically inappropriate, in which case, such determination shall be recorded with specificity in the inmate's chart.

21. Inmates with Hepatitis C shall be treated in accordance with CDC guidelines, unless NCCC's physician deems such treatment medically inappropriate, in which case, such determination shall be recorded with specificity in the inmate's chart.

22. In the event an inmate refuses to voluntarily cooperate in the screening and/or test(s) referred to in paragraphs 17-21, after being advised of its importance to the inmate's health needs, then such refusal shall be documented by medical center personnel. In such event, NCCC shall take steps medically appropriate for the health of the individual inmate, other inmates and staff.

23. A physician or allied health professional shall perform full health assessments within seven (7) days of an inmate's arrival at NCCC, unless the intake screening indicates the inmate has a contagious illness, is on medication, has immediate medical needs, is intoxicated, is experiencing alcohol or drug withdrawal, or has been participating in a substance abuse or detoxification program, in which case, the provisions of paragraph 24 shall govern.

24. When the initial health screening indicates that the inmate has a contagious illness, is on medication, has immediate health needs, is intoxicated, is experiencing alcohol or drug withdrawal, or has been participating in a substance abuse or detoxification program, NCCC shall conduct a full health assessment within thirty-six (36) hours of the inmate's arrival, and shall provide treatment consistent with the terms of this Agreement, except that assessment and treatment shall be provided more expeditiously if necessary for the inmate's health and safety. NCCC shall continue the same or comparable medication within twenty-four (24) hours unless it is deemed not medically indicated by NUMC physician staff or not consistent with standard medical practice after diligent efforts are made, and documented, to contact the inmate's treating physician.

25. NCCC shall ensure that the NUMC keeps records, by month, of the number of health assessments performed on new inmates and whether the assessments were performed in a timely or untimely manner.

**D. Sick call**

26. NCCC shall provide sick call five (5) days a week by the clinical staff. NCCC shall ensure that a licensed physician is on call twenty-four (24) hours a day, seven (7) days a week, for immediate access by allied health professionals. Nurses shall be guided by physician approved nursing protocols.

27. NCCC shall develop and implement written sick call policies, procedures, and practices which shall include, at a minimum, the following: (1) written sick call request slips available in English and Spanish; (2) a confidential collection method in which the request slips go directly to the medical personnel; (3) a logging procedure to record each request for sick call services, the date the inmate was seen, and the disposition (e.g., referral; whether inmate seen at sick call) of the sick call visit; (4) procedures and policies that ensure that all sick call requests are evaluated by clinical staff within 24 hours; (5) procedures and policies that ensure that medical evaluation and treatment occurs in a manner that is timely for the medical complaint; (6) procedures and practices which ensure that illiterate inmates can orally access the sick call system by requesting access through staff, who must, as soon as reasonably possible after the oral request, fill out a request slip for the inmate; (7) procedures and practices which ensure that inmates with visual impairments, who are blind, or who have physical or cognitive disabilities which impair their abilities to complete sick call slips, can orally access the sick call system by requesting access through staff, who must, as soon as reasonably possible after the oral request, fill out a request slip for the inmate; (8) procedures and practices which ensure that all inmates, irrespective of primary language, can access the sick call system; (9) procedures and practices which ensure that results of the sick call visit are recorded in the inmate's medical record consistent with the provisions of this Agreement; (10) procedures and practices which ensure timely referrals, follow-up and provision of medication; (11) procedures which ensure timely receipt of mental health services by inmates requesting such services through the sick call process; and (12) staff training regarding these procedures and policies.

28. No inmate shall be disciplined for or otherwise be discouraged from accessing the health care delivery system.

29. At least three (3) times a week, documented rounds will be conducted in segregation. Inmates submitting sick call requests in segregation shall access the sick call system and be seen by qualified medical professionals in accordance with the policies and procedures developed and implemented pursuant to paragraph 27.

**E. Chronic Diseases**

30. NCCC shall develop and implement a written chronic care disease management program. As part of this program, NCCC shall maintain an updated chronic disease registry of inmates suffering from chronic illnesses, including, but not limited to, the following conditions: asthma, cardiac disease, elevated lipids, diabetes, HIV infection, hypertension, and seizure disorder.

31. NCCC shall develop and implement a written updated chronic disease treatment guidelines consistent with nationally accepted guidelines for the diseases, in order to provide appropriate treatment for chronic illnesses, including routine tests, examinations, follow-up, treatment plans and continuity and coordination of care.

32. NCCC shall keep records of all care, including

routine tests and examinations provided to inmates suffering from chronic illnesses. Such records shall be maintained in the inmate's individual file.

**F. Medication Management**

33. NCCC shall develop and implement written policies and procedures to ensure appropriate delivery and continuity of medication. Such procedures shall include timely distribution of medication to inmates who have visits or are out to court; procedures that ensure access to medication in emergencies and on weekends; contemporaneous documentation and monitoring of dosages dispensed and received and documentation of refusals and no-shows; and procedures that ensure that medication errors are recorded and monitored.

34. Only trained and qualified medical staff shall administer medications. NCCC shall provide pharmaceutical staffing and coverage sufficient to address inmates' serious medical and mental health needs.

35. NCCC shall develop and implement written policies and procedures providing for patient-specific medication administration records. Such procedures shall include filing of medication administration records in the inmate's medical record. NCCC shall develop and implement written policies and procedures regarding inmates' refusal to take or receive medication. These policies and procedures shall include counseling inmates regarding the value of the proffered medication, documenting such counseling, and recording the basis for the inmate's refusal.

36. NCCC shall implement an automated drug profile system which shall, for example, identify adverse interactions between medications and duplication of therapeutic categories.

37. Upon inmates' release from detention, NCCC shall offer inmates the opportunity to be provided with (1) a seven (7) day supply of appropriate medication for inmates suffering from HIV; (2) a five (5) day supply of psychotropic medication to inmates receiving such medication while incarcerated; and (3) prescriptions for appropriate medication (other than those referred to in (1) and (2), in sufficient quantities to inmates. Upon inmates' release from detention, Nassau County shall continue to provide inmates with TB with prescription medication and treatment in conformity with recognized standards and protocols applicable to TB prevention and treatment. For purposes of this provision, the number of days shall commence beginning with the day the inmate is released from detention. NCCC shall develop and

implement written policies and procedures which facilitate continuity of medication upon release, including, but not limited to assisting inmates with accessing public health benefits and services. Nassau County may seek to recover from individuals with private medical coverage or medical insurance the costs of medication provided pursuant to this provision.

**G. Medical Records**

38. NCCC shall develop and implement written policies and procedures for maintaining unified and collaborative health records. Such procedures shall include maintenance of a single medical record for each inmate covering all admissions to NCCC, inclusion of current notes from all health care providers, and all medication administration records. All medical records, including laboratory reports, etc., shall be timely filed (i.e., within three (3) days of review, creation, or use).

39. Medical records shall be separate from the inmate's institutional record. Access to individual inmate medical records shall be restricted to medical personnel and to the legal section of the jail and the County when necessary to respond to formal complaints of failure to provide medical care or those alleging injury due to excessive force. Medical information shall be shared with NCCC officers only when the director of the medical unit or the Sheriff or his designee or the Deputy Undersheriff in charge of investigations believes sharing of this information is necessary for the health, safety or security of the institution, staff and inmates. NCCC staff shall be prohibited from divulging inmate medical information to other inmates.

**H. Treatment of Female Inmates**

40. NCCC shall develop and implement written guidelines for medical care for women, including routine screening for pregnancy, timely screening for sexually transmitted disease, HIV counseling and testing and routine gynecological and obstetric care. NCCC shall write and follow treatment plans for pregnant women, which shall include discharge planning.

**I. Drug and Alcohol Treatment**

41. NCCC shall develop written policies and procedures establishing a medical detoxification process.

42. Inmates with co-existing disorders shall be permitted to participate in NCCC's substance abuse treatment programs. Exclusion from participation shall be made on a case by case basis.

43. Subject to approval by the New York State Office of Alcohol and Substance Abuse Services ("OASAS"), NCCC shall discontinue its current policy and practice of excluding pre-sentence inmates charged with certain crimes from participating in its substance abuse treatment programs. Exclusion from participation shall be made on a case by case basis.

44. NCCC shall use its best efforts to expand the size of its Drug, Alcohol, Rehabilitation Treatment ("DART") and "Stop DWI" programs to accommodate additional participation.

45. NCCC shall maintain waiting lists for its substance treatment programs and shall document the number of individuals requesting, receiving, and denied such treatment.

**J. Mental Health Treatment and Special Needs**

46. NCCC shall develop and implement treatment plans for inmates with special needs, such as the frail elderly, and inmates with mental illness, disabilities, communicable diseases, or terminal illness. Treatment plans shall include discharge planning.

47. NCCC shall develop and implement written policies and procedures to ensure that inmates requesting mental health services, inmates who become suicidal and inmates who develop serious mental illness while incarcerated are evaluated and treated timely, irrespective of the manner in which the services are requested. A sufficient number of hospital beds shall be available for acute mental health inmates who are determined by medical staff to require hospitalization. Mental health staff shall be provided with up to date housing lists of inmates to ensure continuity of care. Inmates with positive suicide screens shall be provided with active supervision and shall be timely seen and evaluated by mental health staff.

48. Community based volunteers shall conduct regular community meetings for inmates in mental health units similar to those provided in NCCC's drug treatment programs.

**K. Mortality Reviews**

49. NCCC shall cause to be performed an autopsy for every inmate who dies while in the custody of NCCC, as required by New York State law. NCCC shall cause to be performed a mortality review for every inmate who dies while in the custody of NCCC as part of the NCCC's quality improvement program.

50. Mortality reviews shall involve physicians, nurses, and other relevant NCCC personnel (as appropriate) and shall seek to determine whether there was a pattern of symptoms which might have resulted in earlier diagnosis and intervention. All autopsy reports and related medical data shall be provided to SBI. SBI and security staff shall fully cooperate with the New York State Commission of Correction reporting requirement under 9 NYCRR § 7022. In addition, mortality reviews shall examine events immediately surrounding the inmate death to determine if appropriate interventions were undertaken.

**L. Medical Safety and Sanitation**

51. NCCC shall develop and implement written current site-specific blood borne pathogen and tuberculosis policies and procedures, including control plans consistent with Centers for Disease Control ("CDC") guidelines. Such plans shall include prompt evaluation of diagnostic reports and procedures to eliminate any unreasonable delay between identification and treatment of tuberculosis. NCCC shall train all staff on these plans on an annual basis. Only trained staff shall perform medical waste disposal and clean-up.

52. NCCC shall develop and implement a written exposure control plan that is consistent with OSHA requirements.

53. NCCC shall maintain a clean and safe environment in all medical areas, including establishing and implementing controls regarding dangerous medical instruments and medical waste disposal.

**M. Inmate Education**

54. NCCC shall implement a regular program for educating inmates on health related issues, including HIV education and counseling, other infectious diseases, diseases with which they have been diagnosed, and birth control education and counseling.

**N. Quality Assurance and Improvement**

55. NCCC shall develop and implement a written functional quality improvement program for medical and mental health care, which shall include development of a written quality improvement plan that includes annual self-evaluation, the provision of evaluations and recommendations regarding clinical guidelines, the selection of performance indicators, internal peer review and the establishment of a Quality Improvement Committee ("QIC"). The QIC shall be responsible for implementation of the quality improvement plan and shall serve as the conduit for all quality improvement activities.

56. The QIC shall be chaired by a physician and shall include a multi-disciplinary review necessary to properly review the status of health care provided to inmates and NCCC. The QIC chair may appoint subcommittees for focused work. The QIC shall meet ten (10) out of twelve (12) months each year, and shall record or take minutes of its meetings and maintain records of documents or files reviewed. The NCCC Quality Improvement Coordinator shall report monthly to the Sheriff, and to the chair of the NUMC's Quality Improvement Council.

57. The quality assurance program shall include an annual work description; a work plan; and a program evaluation.

58. The QIC shall develop written protocols for regularly providing workshops regarding the provision of medical and mental health care to clinical and administrative staff.

## III. USE OF FORCE

### A. Staffing

59. NCCC shall require all Nassau County Sheriff's Department employees assigned to the Nassau County Sheriff's Department Division of Correction ("staff" or "correctional staff") to advise the Sheriff or his designee in writing of any arrest or conviction, plea of guilty or nolo contendere to any felony or misdemeanor charge, or the issuance of any order of protection against the staff member within one week of such event, and shall require the staff member to advise the Sheriff or his designee in writing regarding any change in the status of any such matter. The failure to so report shall result in disciplinary proceedings. NCCC shall independently monitor the status of any matters reported to the facility by staff pursuant to this paragraph and shall evaluate the propriety of such staff's continued contact with inmates and remove staff from such contact where appropriate. All statements required in this paragraph shall be maintained in the files of the investigation unit and/or the employee's personnel file.

60. NCCC shall request in writing that the District Attorneys of Nassau, Suffolk, Kings, Queens, Richmond, New York, and Bronx Counties notify the Sheriff or his designee of NCCC staff convictions or pleas described in paragraph 59. NCCC shall request in writing that the Nassau County Attorney's Office advise NCCC of any judgment, civil adjudication or settlement against a NCCC employee for actions filed pursuant to 42 U.S.C. § 1983 and of any adjudicated administrative determinations against NCCC employees or any administrative settlements entered by NCCC employees related to claims of discrimination. NCCC shall evaluate the propriety of such staff's continued contact with inmates and remove staff from such contact where appropriate.

61. Prior to hiring, it is understood and agreed that the Nassau County Civil Service Commission shall perform all background checks on all candidates for correctional positions and shall evaluate the results of such checks in hiring or placement decisions. Such checks shall include a fingerprint check by the FBI; criminal arrest and conviction record; law enforcement agency check of addresses where the applicant has lived; military discharge status; investigation of any record of, or civil adjudications or settlements revealing assault, improper use of force, domestic violence, bias or discrimination.

### B. Training

62. NCCC shall provide at least one-hundred sixty (160) hours of pre-service training to all correctional staff, prior to staff being assigned to a platoon. The training shall include sufficient amounts of time devoted to use of force, use of force reporting, staff professionalism, diversity training, dealing with inmates with mental illness or mental health issues, dealing with female inmates, and potential criminal and civil liability for the use of excessive force. Use of force training shall include the following: (1) when force may be used; (2) alternatives to the use of force; (3) prohibitions against the use of excessive or unnecessary force; (4) control techniques intended to minimize injury to staff and inmates; (5) reporting

126. Within twelve (12) months after execution of this Agreement, DOJ shall conduct a second on-site compliance monitoring tour of NCCC.

127. DOJ shall conduct a third on-site compliance monitoring tour of NCCC to evaluate NCCC's compliance with this Agreement approximately twenty-four (24) months after execution of this Agreement. Upon the reasonable request of DOJ or the Joint Expert, NCCC shall permit site visits on a more frequent basis than set forth in Paragraphs 125 through 127. If NCCC has substantially complied with the Settlement Agreement, DOJ and NCCC will file a joint motion to dismiss the case.

128. If DOJ determines that NCCC has not substantially complied with this Agreement, the United States may file a motion to restore the case to the Court's active docket for purposes of litigating the allegations in the Complaint.

129. The United States reserves the right to file a motion to restore this case to the Court's active docket for purposes of litigating the allegations in the Complaint at any time if it believes NCCC is not making a good faith effort to substantially comply with the Settlement Agreement. The United States shall give NCCC fourteen (14) calendar days' written notice before the filing of such motion.

130. In the event that the allegations in the underlying complaint are litigated (i.e. through a trial or dispositive motions), this Settlement Agreement shall not be introduced or used as evidence.

131. This Agreement shall be binding on all successors, assignees, employees, and all those working for or on behalf of the defendants to this action.

132. Notice under this agreement shall be provided by Federal Express overnight delivery and shall be provided to the Sheriff of Nassau County and to NCCC's counsel as designated by written notice to DOJ.

For the United States

/s/ Alan Vinegrad

ALAN VINEGRAD
United States Attorney
Eastern District of
New York

/s/ Sanford M. Cohen

SANFORD M. COHEN
Chief, Civil Rights
Litigation

/s/ Marla Tepper

MARLA TEPPER
PAMELA CHEN
Assistant U.S. Attorneys
U.S. Attorney's Office
Eastern District of
New York
147 Pierrepont Plaza
Brooklyn, New York 11201

/s/ Ralph F. Boyd

RALPH F. BOYD, JR.
Assistant Attorney General
Civil Rights Division

/s/ Steven H. Rosenbaum

STEVEN H. ROSENBAUM
Chief
Special Litigation Section

/s/ Mellie H. Nelson

MELLIE H. NELSON
Deputy Chief
DANA SHOENBERG
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
P.O. Box 66400
Washington, D.C. 20035-6400

For Nassau County

/s/ Thomas Gulotta

THOMAS GULOTTA
Nassau County Executive

/s/ Alfred F. Samenga

ALFRED F. SAMENGA
Nassau County Attorney

/s/ Edward Reilly

EDWARD REILLY
Sheriff of Nassau County

**VERIFICATION**

STATE OF NEW YORK)
) SS:
COUNTY OF NASSAU )

MARGARET GLEESON, being duly sworn, deposes and says, as follows:

I am one of the plaintiffs herein, and I have read the foregoing complaint and know the contents thereof and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true.

Margaret Gleeson
MARGARET GLEESON

Sworn to before me this
6th day of November, 2015

Alexander Pabst
Notary Public

ALEXANDER C. PABST
Notary Public, State of New York
No. 02PA6219991
Qualified in Nassau County
Commission Expires April 5, 2018

***Index No.*** ***Year 2015***

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**JOHN GLEESON, in His Own Right and as Co-Administrator of the Estate of JOHN P. GLEESON, Deceased, MARGARET GLEESON, in Her Own Right and as Co-Administrator of the Estate of JOHN P. GLEESON, Deceased, and DONNA DEMPSEY, on behalf of and as the Natural Parent and Guardian of the Property of both ERIN ANNEMARIE GLEESON, an Infant and JOHN PATRICK GLEESON, an Infant,**

**Plaintiffs,**

**-against-**

**COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU COUNTY SHERIFF'S DEPARTMENT, MICHAEL J. SPOSATO, Individually and as Sheriff of Nassau County, ARMOR CORRECTIONAL HEALTH SERVICES, INC., ARMOR CORECTIONAL HEALTH SERVICES OF NEW YORK, INC., NASSAU COUNTY CORRECTIONS OFFICERS, "JOHN DOES 1-10," in their Individual and Official Capacities, ARMOR CORRECTIONAL HEALTH SERVICES, INC. EMPLOYEES and AGENTS, "JOHN and JANE DOES 11-20," in their Individual and Official Capacities,**

**Defendants.**

## VERIFIED COMPLAINT

**THE PASCARELLA LAW FIRM, PLLC**
*Attorneys for Plaintiffs*

***Nassau Office:***
*1551 Franklin Avenue*
*Mineola, New York 11501*
*(516) 741-FIRM (3476)*
*(516) 742-1134*

***Suffolk Office:***
*775 Park Avenue*
*Suite 255*
*Huntington, New York 11743*
*(631) 789-FIRM*

---

*To:*

*Attorney(s) for*

*Service of a copy of the within* *is hereby admitted.*

*Dated:*

------------------------------------------

*Attorney(s) for*

**PLEASE TAKE NOTICE**

☐ that the within is a (certified) copy of a
entered in the office of the clerk of the within named Court on 19

☐ that an Order of which the within is a true copy will be presented for settlement to the
Hon. one of the judges of the within named Court,
on 20 , at .M.