# EXHIBIT 32

NEW YORK STATE COMMISSION OF CORRECTION

---------------------------------

In the Matter of the Death           :        FINAL REPORT OF THE
of Antonio Marinaccio an inmate of     :        NEW YORK STATE COMMISSION
the Nassau CJ                   :        OF CORRECTION
                                   :

---------------------------------

To:    Sheriff Michael J. Sposato
       Nassau County Sheriff's Office
       100 Carman Avenue
       East Meadow, New York  11554

ARMOR 000406                                 CONFIDENTIAL

FINAL REPORT OF ANTONIO MARINACCIO                    Page |2

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47(1)(d), regarding the death of Antonio Marinaccio who died on May 5, 2015, as a result of circumstances which occurred while an inmate in the custody of the Nassau County Sheriff at the Nassau County Jail, the Commission has determined that the following final report be issued.

FINDINGS:

1.    Antonio Marinaccio was a 53-year-old Caucasian male who died on 5/2/15, of anoxic encephalopathy following cardio-respiratory arrest due to acute myocardial infarction and atherosclerotic coronary artery disease while in the custody of the Nassau County Sheriff. The Medical Review Board finds that Marinaccio received inadequate health care from Armor Inc., the contracted medical provider of the Nassau County Correctional Center, due to having an unrecognized acute myocardial infarction with probable electrocardiogram changes that could have been detected had he received a proper medical examination. Had Marinaccio's signs of his myocardial infarction been recognized and sent to a hospital to receive percutaneous cardiac intervention, his death may have been prevented.

2.    Marinaccio was born in New York and resided with his mother. He was a high school graduate and stated he was unemployed due to herniated discs. He was single and with no children.

3.    Marinaccio had an extensive criminal history. He had been arrested 15 times and convicted 12 times including five felonies. Most of his arrests were related to driving while under the influence of drugs or alcohol. He served a prison term from 2000 - 2004. Marinaccio was in Nassau County Correctional Center for the instant office of Resisting Arrest, Felony DWI, and other vehicle and traffic law offenses.

4.    Marinaccio had no mental health history with the exception of substance abuse. His earliest arrest was at age 17 for driving while intoxicated. Medically, he suffered from asthma and herniated discs. Marinaccio used albuterol rescue inhalers to treat his asthma. He reported no hospitalizations.

5.    On 10/16/13, Marinaccio was arrested for Assault 2nd with Intent to cause Injury to an Officer/Fireman/EMT/Nurse. He was able to post bail. While this case was awaiting disposition, he was arrested on 4/17/14, for Driving While Intoxicated (DWI) in the Town of Hempstead by the Nassau County Police Department. He was arraigned on the same day for DWI and 13 other Vehicle Traffic Law (VTL) violations. On 2/3/15, Marinaccio plead guilty and sentencing was pending. On 4/24/15 Marinaccio was sentenced to one year in the Nassau County Correctional Center (NCCC).

6.    Marinaccio was transported to NCCC by the Nassau County Sheriff's Office and arrived at 5:11 p.m. on 4/24/15. The booking officer noted that his physical condition was fair. Marinaccio admitted to using alcohol and taking medications. He reported his herniated discs and medications for asthma.

                    CONFIDENTIAL

7.    Marinaccio was classified to maximum security with no medical or mental health override. He was assigned to the B building 2nd Floor, C block, cell #3.

8.    At 11:00 p.m., Marinaccio was seen by health staff for his admission history and assessment. He was evaluated in the *"Core"* medical office by RN C.M. A complete set of vital signs were taken and recorded as Temperature 98.4, Pulse 86, Respirations 15, Blood Pressure 101/74 and Peak Flow of 250-300. A history was documented and an assessment was completed.

9.    Marinaccio stated his medical problems were active asthma with his last attack being 4/23/15. He stated his asthma was treated with Proventil and albuterol. *"Dislodged herniated disc"* was the condition he reported in his back. He stated that he was disabled because of this. It is documented that Marinaccio took Percocet in the *"Drug Use"* section of the history, but did not list any prescribed medications for back pain. Per interview with Commission staff, RN C.M. stated that Marinaccio came into the medical department with papers in his hands listing narcotics, but they were not recent.

10.   Marinaccio stated that he had been suffering from a productive cough with expectoration of green mucous for two weeks prior to admission to the facility. Marinaccio also had poly-substance abuse. He admitted to regular use of alcohol, cigarettes, crack cocaine, marijuana and Percocet. He stated he *"went on a binge of drugs and alcohol till jail."* Marinaccio's mental health history was unremarkable. He was not found to be at risk for suicide.

11.   In the nursing assessment, it is documented by RN C.M. that Marinaccio appeared *"anxious and disheveled."* He was alert, oriented and his behavior was described as aggressive. Marinaccio's respiratory status was noted as *"coughing and wheezing"* on the *"Intake Health Screening."* On the *"Health Assessment"* they are documented as, *"WNL."* RN C.M. performed a CIWA assessment on Marinaccio. He scored a three for being agitated and anxious.

12.   Per an interview with Commission staff, RN C.M. stated that she asked Dr. H.S. if she could, *"do an EKG and get a chest x-ray"* on Marinaccio because she had a *"grave feeling about him."* She reported that Dr. H.S. did not want those tests performed. She described Dr. H.S. as *"upset"* that she asked him to do those tests. C.M. added that she requested Dr. H.S. to examine Marinaccio.

13.   Per an interview with Commission staff, Dr. H.S. stated that RN K.M. asked him to *"Listen to his lungs."* Dr. H.S. reported, during an interview with Commission staff, that RN K.M. gave him a verbal report regarding Marinaccio's history and presentation. Dr. H.S. informed Commission staff that at he examined Marinaccio. Dr. H.S. stated that Marinaccio was *"coughing"* bringing up green sputum and had rhonchi in his lungs." Dr. H.S. reported that he wrote orders but did not write a progress note. The Medical Review Board finds that the lack of a written examination note in the progress notes by Dr. H.S. represents inadequate documentation and does not provide evidence that an examination occurred. This is a violation of Commission of Correction Minimum Standard §7010.2 (Health Services) which states, *"Prompt screening is essential to identify serious or life-threatening medical conditions requiring immediate evaluation and treatment. Appropriate medical appraisal of inmates is necessary to reduce the risk that a serious physical deficiency or medical emergency will be obscured by drug or alcohol ingestion."*

Additionally had Dr. H.S. ordered the EKG and performed a thorough medical exam, Marinaccio's impending myocardial infarction may have been identified.

14.  Medication orders for Marinaccio were albuterol Nebulizer 1 Unit dose X 1 dose now, albuterol inhaler 2 puffs q.i.d. prn, KOP (keep on person) X 30 days, Qvar 80mg 2 puffs t.i.d. X 30 days, Levaquin 500mg daily for three days, Tylenol 650mg b.i.d. as needed X 30 days and CXR, PA/Lateral. There was no evidence in the medical record that shows that Marinaccio received the albuterol inhaler, the Qvar inhaler, any doses of Levaquin or the chest x-ray. The Medical Review Board finds the interruption of Marinaccio's routine asthma treatment and the lack of provision of Levaquin during his incarceration was negligent care.

15.  During the investigation, the "X-ray Log" was examined. This log is where names of inmates are placed when an order is written for a radiology study.. There is no evidence that Marinaccio was added to this list when the order was written. Additionally, it appears that the last order written for the chest x-ray may have been added at a later time. There are two physician signatures noted under the orders. The Medical Review Board finds that there is not sufficient evidence to show that the order for the chest x-ray was ever transcribed which resulted in a crucial diagnostic exam not being performed on a symptomatic inmate with underlying chronic disease.

16.  RN C.M. stated that Marinaccio was given the albuterol nebulizer treatment and Marinaccio's lung sounds and peak flow improved. When asked by Commission staff where this was documented, RN C.M. stated that she documented a lengthy progress note for Marinaccio's admission in addition to the forms that are required. This note had the response to the albuterol treatment. Per RN C.M., this note included that she requested a chest x-ray and EKG, and the physician did not want to do the tests. During an interview with Commission staff, RN C.M. stated that when she returned to the medical office following Marinaccio's collapse on 4/26/15, this progress note was missing from the record. However RN C.M. stated, during an interview with Commission staff, that she did not fill out an incident report with Armor Inc. management to report the missing documents nor were there any witnesses to this.

17.  Following Marinaccio's admission, RN C.M. wrote four referral forms. One was to Behavioral Health because Marinaccio was placed on alcohol and drug withdrawal protocol (CIWA). The other three were to the health care provider regarding his history of asthma, herniated disc and current lower respiratory symptoms.

18.  Marinaccio had no events through the night. A CIWA exam was not performed on Marinaccio during the night shift.

19.  On 4/25/15, Marinaccio was seen by RN C.M. (Note: RN C.M. that cared for Marinaccio on 4/25/15, is different from RN C.M. that performed the admission assessment on 4/24/15) from 9:09 a.m. to 9:32 a.m. per the Floor Activity Sheet. An, Urgent Care Assessment was completed by RN C.M., from 9:11 a.m. to 9:29 a.m. It was documented that Marinaccio complained of shortness of breath. Vital signs were taken, temperature 98.6, pulse 98, respirations 16, and blood pressure 112/70. Oxygen saturation was 95%. It is documented on the form, "Wheezes present in lungs." The physician assistant, A.H. was contacted by phone and an order was received for an albuterol nebulizer treatment which was administered. Per the documentation, Marinaccio left the medical department at 9:29 a.m., in, "good" condition.

FINAL REPORT OF ANTONIO MARINACCIO                                    Page | 5

20.    At 9:37 a.m., Marinaccio was taken from the unit to "ID" and returned at 9:47 a.m. The record shows that Marinaccio received a CIWA assessment at 10:00 a.m. by RN C.M., which he scored zero. Also at 10:00 a.m., Marinaccio was moved from cell #3 to cell #9 due to a plumbing problem. A second CIWA assessment was done at 9:00 p.m. which Marinaccio scored a zero.

21.    Officer K.M. assumed supervision of the C & D blocks at 12:01 a.m. on 4/26/15. At 2:45 a.m., Marinaccio complained to Officer K.M. that he was having chest pain. Officer K.M., stated during an interview with Commission staff that Marinaccio told him, "I feel like I am having a heart attack." Officer K.M. made notification to medical for an emergency sick call for Marinaccio.

22.    Sgt. T.N. reported in his statement that RN B.C. responded to the cell at 2:50 a.m. to evaluate Marinaccio. The documentation by RN B.C. is an "Urgent Care Assessment." It states that the assessment began at 3:25 a.m. and ended at 3:30 a.m., a 35 minute discrepancy from corrections staff statements. Per an interview with Commission staff, RN B.C. stated that the time on his form may have been inaccurate because he completed his documentation following the event. The form stated Marinaccio's complaint was "feeling warm and achy all over. Coughing, non-productive." Vital signs were 97.2 temperature, 68 pulse, 18 respirations, 100/72 blood pressure and SPO2 of 94%. The nursing progress note by the same RN B.C., states that Marinaccio was sitting on his bed, alert and oriented, and able to make needs known. Marinaccio was able to "ambulate to the bars without difficulty." The assessment was documented as "Lung sounds clear bilaterally, skin warm, no shortness of breath and no acute distress." Marinaccio was instructed to follow up with health care provider in the morning. No treatment was given. During an interview with Commission staff, RN B.C. stated that Marinaccio did not complain of any pain at any time during this interaction. RN B.C. stated to correction staff and during an interview with Commission staff that Marinaccio would be evaluated further by medical staff later that morning. The medical record shows a referral form to the health care provider was created by RN B.C.

23.    At 3:18 a.m., Officer M.M. assumed patrol of the C and D blocks. Per Officer M.M., at 3:34 a.m. he was making a security round and noted that Marinaccio was laying on the floor face down. Officer M.M. shouted to Marinaccio, but he did not respond. M.M. documented that he alerted other staff members, activated his body alarm and notified the sergeant.

24.    Officers M.R., R.A., and C.C. responded with Sgt. T.N. RN B.C. also responded. Officers consistently stated during the interviews with Commission staff that Marinaccio was lying face down on the floor with white foam coming from his mouth. Responding officer M.R. was instructed by RN B.C. to remove Marinaccio from his cell. Officer M.R. and Officer R.A. moved Marinaccio from the cell to the common area of the unit. During this time, Officer M.R. noticed that Marinaccio was not breathing. He documented "I asked RN B.C. to start CPR, he did not, he left to get LPN L.A." Officers M.R. and R.A. began CPR per their statements and during the interview with Commission staff.

25.    RN B.C. documented that he responded to Marinaccio's cell. In a nursing progress note the following was documented: "Pt observed unresponsive, difficult to arouse and not breathing. Pulse, carotid. weak, AED applied, advised shock and shock delivered. Began CPR. Patient suctioned for a small amount of whitish secretions. CPR continued while awaiting 911. AED in use shock X4." During an interview with Commission staff, RN B.C.

ARMOR 000410                                    CONFIDENTIAL

stated that he was in the medical office when he heard the alarm. When asked what equipment he brought he stated *"I may have brought the emergency bag, wheelchair and the oxygen."* RN B.C. reported that he had to leave the scene to obtain the AED. He also reported that he entered the cell to perform an assessment. He further stated that LPN L.A. arrived on the scene with him. LPN L.A. stated during an interview with Commission staff, that he was on scene before RN B.C. returned to the area. The Medical Review Board finds that RN B.C. leaving the scene of a patient requiring resuscitation meets the definition of abandonment as found in Section 29.2(a) of the Rules of the Board of Regents which states that unprofessional conduct shall include:

> *"Abandoning or neglecting a patient or client under and in need of immediate professional care, without making reasonable arrangements for the continuation of such care."*

26.    Per statements, Emergency Services arrived at 3:50 a.m. Per the Patient Care Report from the Nassau Police Department Ambulance Service states that following further defibrillation and Advanced Cardiac Life Support protocols, spontaneous circulation returned temporarily. Marinaccio then went into the rhythm Torsade de Pointe. This rhythm continued until care was transferred over to Nassau University Medical Center (NUMC).

27.    Marinaccio was transported to NUMC. An EKG showed Marinaccio had an inferior wall myocardial infarction. CT of the brain showed evidence of hypoxic brain injury. Marinaccio was transferred to North Shore Long Island Jewish Hospital (NSUH). At NSUH, Marinaccio was treated with hypothermia protocol, and the MI was medically managed due to unresponsiveness. When hypothermia protocol was completed, a neurology work up was performed. CT of the head showed worsening brain edema and EEG was abnormal. Following the exam, Marinaccio's prognosis was declared extremely poor. The prognosis was discussed with family members, and it was decided to proceed with terminal extubation.

28.    Marinaccio was pronounced dead at 1:18 a.m. on 5/2/15.

RECOMMENDATIONS:

TO THE CHIEF EXECUTIVE OFFICER OF ARMOR INC.:

Armor Inc. shall conduct a detailed quality assurance review regarding the medical care provided to Antonio Marinaccio with a focus on the following:

- Why a thorough assessment was not completed and documented by the physician at the time of admission for a patient with underlying lung disease, symptoms of acute respiratory infection and at risk for withdrawal.

- Why critical medications were not provided as ordered at the time of admission.

- Why a crucial diagnostic chest x-ray was not transcribed into the scheduling log and never performed on a patient with chronic underlying lung disease with symptoms of respiratory infection.

FINAL REPORT OF ANTONIO MARINACCIO                     Page | 7

The results of said review with any corrective action taken shall be forwarded to the Medical Review Board upon completion.

<u>TO THE PRESIDING OFFICER NASSAU COUNTY LEGISLATURE:</u>

The Nassau County Legislature shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's pattern of failing to properly manage patient's chronic and acute medical needs.

<u>TO THE NEW YORK STATE ATTORNEY GENERAL HEALTHCARE BUREAU:</u>

The Medical Review Board requests the Attorney General Healthcare Bureau take notice of the enclosed report as part of their review of contracted healthcare providers at local jails in New York State.

<u>TO THE NYS DEPARTMENT OF EDUCATION, OFFICE OF PROFESSIONAL CONDUCT:</u>

The Medical Review Board requests an investigation be conducted for professional misconduct of Registered Nurse B.C. for abandoning a patient in need of immediate medical care.

WITNESS, HONORABLE PHYLLIS HARRISON-ROSS, M.D., Commissioner, NYS Commission of Correction, Alfred E. Smith State Office Building, 80 South Swan Street, 12th Floor, in the City of Albany, New York 12210 on this 28th day of June, 2016.

Phyllis Harrison-Ross, M.D.
Commissioner

PHR:ET:ams
15-M-53
6/16

Cc:   Bruce Teal, Chief Executive Officer
        Armor Correctional Health Services, Inc.
      Norman Gonsalves, Presiding Officer
        Nassau County Legislature
      NYS Attorney General Healthcare Bureau

ARMOR 000412                                        CONFIDENTIAL