UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 30 2019 ★

BROOKLYN OFFICE

**JOHN GLEESON** in His Own Right and as Co-
Administrator of the Estate of John P. Gleeson,
Deceased, **MARGARET GLEESON** in Her Own
Right and as Co-Administrator of the Estate of
John P. Gleeson, Deceased, **DONNA DEMPSEY**
on behalf of and as the Natural Parent and
Guardian of the Property of both E.A.G., an Infant,
and J.P.G., an Infant,

                     Plaintiffs,

          - against -

**COUNTY OF NASSAU, NASSAU COUNTY
CORRECTIONAL CENTER, NASSAU
COUNTY SHERIFF'S DEPARTMENT,
MICHAEL J. SPOSATO** Individually and as
Sheriff of Nassau County, **ARMOR
CORRECTIONAL HEALTH SERVICES, INC.,
ARMOR CORRECTIONAL HEALTH
SERVICES OF NEW YORK, INC., NASSAU
COUNTY CORRECTIONS OFFICERS,
"JOHN DOES 1-10"** in their Individual and
Official Capacities, **ARMOR CORRECTIONAL
HEALTH SERVICES, INC. EMPLOYEES
AND AGENTS, "JOHN AND JANE DOES 11-
20"** in their Individual and Official Capacities,

                    Defendants.

------------------------------------------------------------ X

**MEMORANDUM & ORDER**
15-CV-6487 (AMD) (RL)

**ANN M. DONNELLY**, District Judge.

     The plaintiffs brought this action against Nassau County, Nassau County Correctional

Center ("NCCC"), Nassau County Sheriff's Department, Nassau County Sheriff Michael J.

1

Sposato (collectively the "County defendants"), Armor Correctional Health Services, Armor

Correctional Health Services of New York (collectively the "Armor defendants"), and unnamed

corrections officers and health services employees, in connection with the death of John P.

Gleeson, who died while he was detained at the NCCC. (ECF No. 1.) The plaintiffs—surviving

members of Mr. Gleeson's family—brought federal claims pursuant to 42 U.S.C. § 1983,

alleging inadequate medical care under the Fourteenth Amendment, and state law claims for

wrongful death and intentional infliction of emotional distress. (*Id.*) On November 19, 2018, the

defendants moved for summary judgment. (ECF Nos. 57, 60.) For the reasons that follow, the

defendants' motion is granted in part, and denied in part.

## BACKGROUND[1]

1. *Medical Services at the NCCC*

The NCCC is a correctional facility operated by the Nassau County Sheriff's Department,

an agency of Nassau County. (ECF No. 69, Pls.' 56.1 Counter-Statement in Response to County

defendants ("Pls.' 56.1 (County)" ¶¶ 2-3.)[2] Between 1999 and 2000, the United States

---

[1] In deciding whether summary judgment is appropriate, the Court resolves all ambiguities and draws all reasonable inferences in favor of the non-moving party, in this case, the plaintiffs. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008).

[2] On a motion for summary judgment, the Court's consideration is limited to factual material that would be admissible in evidence at trial. *Local Unions 20 v. United Brotherhood of Carpenters and Joiners of America*, 223 F. Supp. 2d 491, 496 (S.D.N.Y. 2002). Factual allegations that are disputed without a citation to admissible evidence are deemed admitted, as long as they are also supported by the record. Local Civ. R. 56.1; *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Factual allegations that are not disputed are deemed admitted, as long as they are also supported by the record. *Id.* I will disregard any arguments in the Rule 56.1 statements. *Pape v. Dircksen & Talleyrand Inc.*, No. 16-CV-5377, 2019 WL 1435882, at *2 (E.D.N.Y. Feb. 1, 2019), *report and recommendation adopted*, 2019 WL 1441125 (E.D.N.Y. Mar. 31, 2019).

The parties' 56.1 submissions are not helpful in determining whether there are material disputes of fact. By way of example only, the parties spend far more time disputing the procedural history of this litigation than in developing the chronology of Mr. Gleeson's treatment and death at the NCCC. Nevertheless, I have reviewed the entire record, including Mr. Gleeson's medical records, to determine the extent to which there are factual disputes.

Department of Justice ("DOJ") investigated conditions at the NCCC. (*Id.* ¶¶ 20-21.) On September 11, 2000, the DOJ found that the NCCC was deliberately indifferent to its inmates' medical and mental needs, and that corrections officers at the NCCC had a practice of using excessive force. (*Id.* ¶ 22.) The DOJ sued Nassau County in this Court on April 22, 2002. (*Id.* ¶ 23.) The parties entered into a settlement agreement the same day, dismissing the case subject to the County's compliance with certain terms to improve conditions at the NCCC. (*Id.* ¶ 23-25.)

The settlement agreement included specific policies and programs that the NCCC would develop and implement to improve inmate health care, including: (i) written medical policies, procedures, and protocols relating to initial health assessments, sick calls, emergency care, and medical records (*Id.* ¶ 28); (ii) new inmate health screenings that included the inmates' input about their medical history, current medication, allergy information, and immunization history (*Id.* ¶ 29); (iii) a written chronic care disease management program (*Id.* ¶ 34); and (iv) a written functional quality improvement program that included self-evaluations, recommendations for clinical guidelines, and internal peer reviews (*Id.* ¶ 38). To implement the quality improvement program, the NCCC was required to establish a Quality Improvement Committee ("QIC") chaired by a physician. (ECF No. 74-1, ¶¶ 55-56.) The terms of the settlement required the QIC to have ten monthly meetings each year to "review the status of health care provided to inmates," and to report its work to the Sheriff each month. (*Id.*)

On May 5, 2008, the parties filed a stipulation to dismiss the case because of the NCCC's substantial compliance with the settlement agreement. (*Id.* ¶ 53.) The Honorable Leonard Wexler "so ordered" the stipulation of dismissal on March 20, 2008. (*Id.* ¶ 55.)

2. *The NCCC's Contract with Armor*

On July 20, 2009, the County sought proposals from third-party organizations to provide

3

medical, behavioral, and dental health care at the NCCC. (*Id.* ¶ 56.) The County's request specified that bidders must meet the standards of all DOJ settlement agreements. (*Id.* ¶¶ 57-62.)

On October 13, 2009, the Armor defendants[3] submitted a bid in which they acknowledged and agreed to meet the standards of the settlement agreement, adding that Armor "had experience complying with DOJ requirements having inherited a situation…in which the DOJ cited the facility and the former healthcare provider." (*Id.* ¶¶ 64, 67.) A committee that included representatives from the County's Office of Management and Budget, Department of Health, Office of Mental Health, the Sheriff's Department, and the County Attorney's Office evaluated Armor's proposal, and gave it the highest score of the six other proposals. (*Id.* ¶¶ 85-87.) Armor and the NCCC entered into a proposed contract on March 18, 2011. (*Id.* ¶ 88.)

Pursuant to the contract, Armor agreed to provide services consistent with the standards established by the settlement agreement. (*Id.* ¶ 90.) Armor agreed, for example, to "develop and maintain a chronic care disease management program, consistent with nationally accepted disease guidelines[,]" (*id.* ¶ 96), and to "perform medical and mental health intake screenings within four hours of an inmate's admission to the NCCC." (*Id.* ¶ 93.) The contract also expressly incorporated the services outlined in Armor's contract proposal (*id.* ¶ 90), which included plans to install an electronic medical records system (ECF No. 57-3, Armor Contract 2011-2013 ("2011 Armor Contract") at 92, 228-31) and a protocol for approving referrals to offsite specialists (*id.* at 194-97). In its cost proposal, Armor allocated $78,688 of the contract cost for the installation of the electronic medical records system in the first year of the contract. (*Id.* at 92.) Armor represented that it emphasized "medical necessity" when it screened requests

---

[3] The Armor defendants are foreign corporations authorized to conduct business in the state of New York. (ECF No. 72, Pls.' Counter-Statement in Response to Armor defendants ("Pls.' 56.1 (Armor)" ¶ 5.))

for offsite treatment; according to Armor, its process reduced "unnecessary offsite trips" and resulted in "substantial savings in security costs and NCCC overhead." (*Id*. at 194-97.) Under Armor's protocol, an Armor clinician initiated the process by submitting a specialist's request form to Armor's Director of Utilization Management and Medical Director of Utilization Management, both of whom were in Florida. (*Id.*) The directors reviewed the request to determine whether it was a "medical necessity" and either approved it or deferred it to be reevaluated within 30 days. (*Id.*)

On April 18, 2011, the proposed contract was submitted to the Rules Committee of the Nassau County Legislature for approval. (Pls.' 56.1 (County) ¶ 106.) Michael Golio, Commanding Officer of the Sheriff's Department's Legal Unit at the NCCC, spoke in favor of the proposed contract, and highlighted its accountability and high standards of care: "The second part of this contract is the care standards, and that's why we have the performance indicators, the performance measurements, and the financial penalties. We don't have anything of that sort currently with [the Nassau University Medical Center]."[4] (*Id.* ¶ 110.) The Rules Committee approved the contract and, on May 5, 2011, the Nassau County Executive signed the contract with Armor. (*Id.* ¶¶ 112-13.)

On June 11, 2011, only eleven days after Armor began providing medical care at the NCCC, an inmate, Roy Nordstrom, died of an acute myocardial infarction. (ECF No. 71-31.) On September 18, 2012, the New York State Commission of Correction's Medical Review Board[5] issued a report addressed to Sheriff Sposato and copied to Edward P. Mangano, who was

---

[4] The Nassau University Medical Center provided medical care to inmates at the NCCC before Armor. (ECF No. 71-4, Report of Nassau County Comptroller George Maragos ("Comptroller Report"), at i.)

[5] The Medical Review Board consists of six members appointed by the governor, with the advice and consent of the senate. N.Y. Correct. Law § 43 (McKinney 2019). Three of the six members must be physicians. *Id.* Among its duties, the Board "investigate[s] and review[s] the cause and circumstances

the Nassau County Executive at the time. The Medical Review Board concluded that Mr. Nordstrom died as a result of "grossly incompetent" medical care, and issued the following directive to the Nassau County Executive:

> The Office of the Nassau County Executive shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's flagrant disregard of New York State Education Law, of the Rules of the Board of Regents, and of New York State nursing practice regulations, to wit, staffing unsupervised Licensed Practical Nurses at the Correctional Center who engaged in nursing practice beyond the scope of their licensure and in unlawful medical practice, who failed to consult with and refer to a physician in a medical emergency, and who failed to hospitalize a critically ill patient.

(*Id.* at 9.)

The County's two-year contract with Armor expired on May 31, 2013. (Pls.' 56.1 (County) ¶ 114.) On August 1, 2013, the County extended its contract with Armor to run until May 31, 2015. (*Id.* ¶ 119.)

3. *John Gleeson's Medical History*

Mr. Gleeson, 40 years old at the time of his death, had a history of hereditary angioedema. He went to the hospital for swelling beginning in 2002, and was diagnosed with hereditary angioedema in 2007 or 2008. (ECF No. 57-11, Margaret Gleeson Dep. ("M.G. Dep."), 105:6-16, 107:8-11.) Hereditary angioedema, which typically results from a quantitative or functional deficiency of the C1 esterase inhibitor protein, is a disorder that causes recurrent, severe swelling in the extremities, gastrointestinal tract, face, throat, and airways. (ECF No. 71-6, ¶ 10.) Left untreated, the airway swelling can lead to asphyxia and death. (*Id.*)

Mr. Gleeson took prednisone (a steroid) and Benadryl (an antihistamine) for his

---

surrounding the death of any inmate of a correctional facility," and submits a report to the Commission of Correction and the administrator of the correctional facility. *Id.* § 47.

angioedema. (M.G. Dep. 123:8-22.) If the swelling moved from his hands to his chest or neck—which was more serious—Mr. Gleeson went to the emergency room. (*Id.*) His mother estimated that he went to the emergency room about ten times for angioedema. (*Id.* 109:4-10.)

### 4. *John Gleeson's Incarceration and Death at the NCCC*

In May of 2014, Mr. Gleeson was arrested for stealing scrap metal wire. On May 28, 2014, a Nassau County grand jury charged him with burglary in the third degree. (Pls.' 56.1 (County) ¶ 120.) Mr. Gleeson was admitted to the NCCC the following day, May 29, 2014, where he was held as a pretrial detainee until his death on July 14, 2014. (*Id.* ¶ 121.); *see also* (Pls.' 56.1 (Armor) ¶¶ 4, 9.) In a health assessment on the day he was admitted, Mr. Gleeson reported asthma as his only significant illness, and that Flexeril (a muscle relaxant) and Percocet (pain medication) were his only medications. [6] (ECF No. 62-1, Armor Medical Records, at 5.)[7] Mr. Gleeson did not disclose that he had hereditary angioedema during the assessment.

On June 10, 2014, Mr. Gleeson filled out a sick call request form, complaining that his arm was swollen and that he had "some kind of reaction." (*Id.* at 13.) A nurse visited him that night and noted on the call form that his swollen arm was "chronic." (*Id.*) A physician's assistant ("PA") saw Mr. Gleeson the next day; Mr. Gleeson had difficulty breathing, pain and difficulty swallowing, and swelling in his left shoulder, neck, and throat. (*Id.* at 29.) The PA treated Mr. Gleeson with a nebulizer, prednisone, and Benadryl, and noted "R/O angioedema" on the urgent care assessment form. (*Id.*) On a chronic care clinic form completed the same day, the PA wrote the following in the section for assessing Mr. Gleeson's conditions: "asthma, HTN,

---

[6] Mr. Gleeson also disclosed his alcohol and heroin use. (*Id.*)

[7] The parties did not include in their 56.1 statements the details of Mr. Gleeson's treatment in the weeks leading up to his death. Accordingly, I have reviewed the handwritten medical records, which are difficult to read, and in some cases, completely illegible. The parties did not depose the medical personnel who authored the records.

? angioedema." (*Id.* at 61.) (question mark in the original).

On June 17, 2014, Mr. Gleeson went to the medical unit, complaining of swelling in his hands, arms, trunk, legs, knees, and other parts of his body. (*Id.* at 28.) Dr. Sanchez saw him, and ordered a blood-draw to test for an "autoimmune disease" and the levels of C1 esterase inhibitor in his blood. (*Id.*) Mr. Gleeson returned to Dr. Sanchez a week later, on June 24, 2014, so that the doctor could examine swelling in his right upper extremity and to discuss the results of the blood tests. (*Id.* at 27.) Dr. Sanchez ordered a re-draw of the C1 Esterase test—the original specimen was not frozen as required by laboratory protocol[8]—and wrote "Rheumatology consult" on Mr. Gleeson's progress note. (*Id.*) On July 1, 2014, a PA saw Mr. Gleeson for an "Urgent Care Assessment" because of swelling on both sides of his neck; once again, the PA prescribed prednisone and Benadryl. (*Id.* at 26.) On the assessment form, under "known medical conditions of [the] patient," the PA listed "asthma, HTN, [and] recurrent episodes of edema..." (*Id.*) A separate note on the form reads "Rheum consult." (*Id.*)

Mr. Gleeson spoke frequently with his mother throughout his incarceration. (*Id.* ¶ 126.) Although neither of them mentioned angioedema specifically, they did discuss his recurring problems with swelling. (*Id.* ¶¶ 128-132.) Ms. Gleeson had known of her son's angioedema diagnosis since 2007 (M.G. Dep. 105:6-16, 107:8-11), but did not mention the condition in conversations with her son, never urged him to discuss his condition with doctors, and never tried to speak with any officials at the NCCC about her son's condition. (Pls.' 56.1 (County) ¶¶ 132, 135); (Pls.' 56.1 (Armor) ¶ 11.) On July 1, 2014, Mr. Gleeson told his mother that his neck and throat "swelled up again...huge today," and that he had been given Benadryl. (ECF No. 57-12, CD of Recorded Phone Calls, 710A20JQ, 4:36-5:06.) His mother replied, "Why don't they

---

[8] ECF No. 57-22, ¶ 12.

send you to the hospital for God's sake?" (*Id.*) Mr. Gleeson said that the doctor told him that he was "on the list to see a different doctor…. a rheumatologist." (*Id.*) Ms. Gleeson responded, "Ok good, just let them figure it out, let them worry about it."[9] (Pls.' 56.1 (County) ¶ 134.)

On July 14, 2014, at 2:40 p.m., Mr. Gleeson complained to Corrections Corporal Carmine Accordino that his throat was swollen. (Pls.' 56.1 (County) ¶ 150.) Corporal Accordino relayed Mr. Gleeson's complaint to Nurse James in the medical unit, who responded that Mr. Gleeson should fill out a sick call sheet because the unit was busy. (*Id.* ¶¶ 151-52.) At 3:00 p.m., Mr. Gleeson complained again about his swollen throat. (*Id.* ¶ 153.) Corporal Accordino relayed his message to the medical unit. (*Id.*) This time, Nurse James directed Corporal Accordino to send Mr. Gleeson to the medical unit, where Mr. Gleeson checked in at 3:10 p.m. (*Id.* at ¶¶ 153-55.) According to the urgent care assessment form, Mr. Gleeson had swelling on his left neck and left hand. (Armor Medical Records at 23.) Under a section of the form entitled "DX," the diagnosis is listed as "R/O hereditary angioedema (C1 esterase)." (*Id.*) Mr. Gleeson was again prescribed prednisone and Benadryl. (*Id.*) He returned to his cell between 3:45 and 4:00 p.m. (Pls.' 56.1 (County) ¶ 155.)

At 8:55 p.m., Mr. Gleeson told Corrections Officer Del Re that his throat was sore and that he needed to go to the medical unit. (*Id.* ¶ 156.) He got to the medical unit at 9:15 p.m., with redness in his throat and swelling of his left tonsil. (Armor Medical Records at 22.) The doctor prescribed an antibiotic, and sent Mr. Gleeson back to his cell at about 9:25 p.m. (Pls.' 56.1 (County) ¶ 158.)

When he returned to his cell, Mr. Gleeson's condition worsened, prompting fellow

---

[9] Neither side includes the full details of the conversation, nor mentions Mr. Gleeson's reference to the rheumatologist.

inmates to yell for help. (ECF No. 74-39, ¶ 4.)[10] Fifteen minutes later, at 10:16 p.m., Mr. Gleeson told Corrections Officer Rubeanau that he could not breathe. (Pls.' 56.1 (County) ¶ 159.) Officer Rubeanau saw that Mr. Gleeson had a significantly swollen throat and trouble breathing, and notified the medical unit of his condition.[11] (Id. ¶¶ 160-61.) Corrections Officer Cavanaugh escorted Mr. Gleeson to the medical unit, and Dr. Sanchez and R.N. Qui examined him at 10:20 p.m. (Id. at ¶¶ 163-64.) The progress note from that night states that Mr. Gleeson had a past medical history of "asthma, hives, angioedema, and HTN." (Armor Medical Records at 24.)

The Armor medical team believed that Mr. Gleeson was suffering from an exacerbation of asthma, and gave him albuterol with a nebulizer. (Id.) Minutes into the treatment, Mr. Gleeson stood up, said that he could not breathe, and collapsed. (Id. at 63.) The Armor medical staff administered an EpiPen, directed Officer Cavanaugh to call 911, and initiated CPR treatment until the EMT arrived fifteen minutes later, at approximately 10:45 p.m. (Id. at 62.) The paramedics tried to intubate Mr. Gleeson twice, but were unsuccessful. (Id.) At 10:56 p.m., the paramedics took Mr. Gleeson to Nassau University Medical Center, where he died at approximately 11:20 p.m. (Pls.' 56.1 (County) ¶¶ 167-69.)

5. *County Response.*

The day after Mr. Gleeson died, July 15, Dr. Marylyn Martin-Naar, an Armor medical director, filled out a death summary report. (Armor Medical Records at 65.) Dr. Martin-Naar

---

[10] The County defendants challenge the declaration of Morgan Smith, another inmate, as inadmissible hearsay. (ECF No. 80-1, § F.) Rule 56(c)(4) of the Federal Rules of Civil Procedure permits the Court to consider a declaration on summary judgment if it is made on personal knowledge and includes facts that would be admissible in evidence. While some of the statements in the Smith declaration may be inadmissible hearsay, the statement that he and other inmates were yelling for help is not offered for the truth of its content, but simply as evidence that the inmates called for help.

[11] According to Mr. Smith, Mr. Gleeson's neck was "two times its normal size." (ECF No. 74-39, ¶ 4.)

wrote that Mr. Gleeson had three diagnoses, including "R/O Acquired Angioedema." (*Id.*) Dr. Martin-Naar also noted that Mr. Gleeson's treatment plan included prednisone and Benadryl, and that "next steps" included referrals to a rheumatologist and allergist to address the patient's "history of recurrent swelling of body parts." (*Id.*) In her initial findings, Dr. Martin-Naar wrote "low esterase inhibitor level" and that the "impression was R/O acquired angioedema." (*Id.* at 66.)

On October 31, 2014, the Nassau County Office of the Medical Examiner determined that Mr. Gleeson died from cardiorespiratory arrest due to laryngeal edema and angioedema. (Pls.' 56.1 (County) ¶ 174.) A year later, on September 15, 2015, the Commissioner of the New York State Commission of Corrections, Dr. Phyllis Harrison-Ross, published a final report of the Medical Review Board's investigation into Mr. Gleeson's death.[12] (*Id.* ¶ 175.) The report is addressed to Sheriff Sposato, and copied to Norma L. Gonsalves, the Presiding Officer of the Nassau County Legislature at the time. (*See* ECF No. 57-22, New York State Commission of Correction's Final Report: In the Matter of the Death of John Gleeson ("NYSCOC Report").) The Board's investigation included interviews with medical and prison personnel, and a review of the relevant medical records. (*Id.*) The Board was highly critical of the way that the Armor medical staff treated Mr. Gleeson:

> Gleeson had a history of Hereditary Angioedema that went unrecognized, misdiagnosed, and improperly treated by the medical providers from Armor Inc. The Medical Review Board has found that Armor Inc.'s

---

[12] In their reply to the plaintiffs' 56.1 counter-statement, the County defendants make a general challenge to the admissibility of some of the plaintiffs' evidence, but do not make a specific objection to the NYSCOC reports. In any event, the NYSCOC reports are admissible as public records under Federal Rule of Evidence 803(8)(A)(iii) because they contain factual findings from a legally authorized investigation, and the defendants have not suggested that the reports lack trustworthiness. *See Moses v. Westchester County Department of Correction*, No. 10-CV-9468, 2017 WL 4386362, at *10-11 (S.D.N.Y. Sept. 29, 2017).

delivery of healthcare in this matter was incompetent and deficient due to a lack of adequate protocol, lack of coordination, lack of effective communication, and deficient medical knowledge by the physicians and midlevel clinicians. This was compounded by a healthcare record that was unorganized, incomplete, and in selected sections illegible. The Medical Review Board finds that Armor Inc., in its contracted locations in New York State, has engaged in a pattern of inadequate and neglectful medical care and questions their ability to meet and provide for the healthcare needs of jail inmates. Had John Gleeson been provided with competent medical care by Armor Inc. in a timely manner, been properly referred to a specialist, received a correct diagnosis, and received proper medical treatment, his death may have been prevented.

(*Id.* ¶ 1.)

The Board was especially critical of the Armor medical staff's failure to refer Mr.

Gleeson to a specialist, once it became clear that its treatments were ineffective:

After four separate clinical encounters with unresolved angioedema with an unknown etiology and refractory to provided treatment, a referral to a specialist (Rheumatologist) should have been of highest priority. The Medical Review Board finds that the medical providers of Armor Inc. at the NCCC lacked the clinical knowledge to recognize that Gleeson was symptomatic of Hereditary Angioedema and continued him on an ineffective course of treatment including antihistamines and steroids. Hereditary Angioedema will not respond to therapy including steroids and antihistamines…Had Gleeson been appropriately referred to a specialist, received a correct diagnosis, and received the proper treatment, his terminal event may have been prevented.

(*Id.* ¶ 13.)

The Board ended the report with specific recommendations:

- that Armor establish an organized and uniform health record system for inmate health and mental care;

- that Armor utilize a system that assigns a single case manager for each inmate's care; and

- that Armor conduct a quality review of the care it gave Mr. Gleeson, with particular focus on "[w]hy a referral to a specialist (rheumatology) was not expedited for Gleeson…?" "[w]hy medical staff did not consider an immediate transfer to a hospital for Gleeson after repeated complaints of edema…?" and "[w]hy medical providers failed to recognize that the prescribed medications would be ineffective, failed to obtain an accurate C1 Esterase reading…and failed to recognize current medications

may actually be trigger mechanism?"

(*Id.* at 7-8.)

The Board also directed the Nassau County Legislature to investigate whether Armor was fit to serve as a correctional medical care provider, with "[s]pecific attention...to Armor's pattern of failing to properly manage patients' chronic medical needs, failing to maintain proper and organized patient records, and failing to provide hospitalization for patients when clinically indicated." (*Id.*)

Nevertheless, in mid-2015, the County entered into another two-year contract extension with Armor, from June 1, 2015, to May 31, 2017. (Pls.' 56.1 (County) ¶ 211.)

On October 17, 2016, the Nassau County Office of the Comptroller issued a review of Armor's and the County's performance under the contract. (ECF No. 71-4, Comptroller Report.)[13] The Comptroller found that Armor's manual records system was inadequate, inefficient, and error prone, that it had high nursing and doctor turnover, and that it failed to document required background and reference checks. (*Id.* at ii.) The Comptroller underscored the Medical Review Board's finding that Armor was responsible for five inmate deaths at the NCCC from 2011 to 2015, and the Board's direction in the last three reports that Armor pay "specific attention" to its "pattern of failing to properly manage patients' chronic medical needs..." (*Id.* at 20-26.) The Comptroller recommended that Armor computerize its records and "strengthen its quality control process to assure medical forms are completed thoroughly and are signed, dated and legible." (*Id.* at ii.) The Comptroller also recommended that Armor "take

---

[13] None of the defendants challenge the admissibility of the Comptroller Report. The County defendants argue that I should disregard the Comptroller Report because it was "created in 2016 and has no bearing on the death of the decedent..." (ECF No. 80-1, § F.) I address this argument in section I.b.iv of this Opinion.

immediate steps to hire and retain a quality medical staff." (*Id.*)

The Comptroller also found that the NCCC "failed to provide adequate oversight to ensure that Armor was in compliance with its contract with the County." (*Id.*) The NCCC did not have a medical professional on staff to oversee Armor despite the contractual agreement for a Health Care Administrator, who was to "oversee administration and monitor compliance with this agreement on behalf of the County[.]" (*Id.* at 8-9) (quoting 2011 Armor Contract at 12.) The Sheriff's Department designated a registered nurse as the Health Contract Administrator; the nurse left in August of 2013, after which the position remained vacant until 2016.[14] (*Id.*) Moreover, New York State Correction Law required that the Board of Supervisors of Nassau County appoint a "reputable physician authorized to practice medicine as physician" to the NCCC. (*Id.*) (citing N.Y. Correct. Law § 501 (McKinney 2019).) The "County Physician," like the Health Contractor Administrator, was to oversee "Armor's work and the medical care provided to the Correctional Center's patients." (*Id.*) The NCCC did not have a County Physician at any point during the Armor contract. (*Id.*) The contract also required Armor to submit monthly reports to the Health Contract Administrator measuring the quality and quantity of its services. (2011 Armor Contract § 4.) The Assistant Attorney General's affirmation, (ECF No. 71-17), discussed below, found that Armor's reports did not include data on approximately half of the twenty-four indicators required by the contract, including medical sick call statistics, mental health statistics, and initial assessment statistics. (*Id.* ¶ 33.)

Because of its lack of oversight, the NCCC failed "to assess performance indicators and

---

[14] In a letter responding to the Comptroller's report, Sheriff Sposato noted that an Interim Health Contract Administrator had been appointed in 2016, and that the Sheriff's Department had published a job announcement for a permanent replacement. (Comptroller Report at 53.) The Comptroller's views were unchanged: "[we] reiterate that this position was vacant from 2011 to 2016 and reemphasize the importance of having a medical professional on site at the Correctional Center to oversee the medical care provided by the contractor." (*Id.* at 59.)

assess associated penalties as provided for in the contract[.]" (Comptroller Report at ii.) Indeed, the County assessed no penalties on Armor during the contract period—despite negotiating for 27 different performance indicators and several tiers of penalties. (*Id.* at 16-17.) Most critically, the County did not fine Armor $155,000 (the highest penalty provided for in the contract) for its failure to achieve NCCHC accreditation. [15] Instead, the County waived the requirement, without seeking the County Executive's approval. (*Id.* at 16.)

In 2016, the State of New York sued Armor, alleging that it had provided substandard medical care to inmates at the NCCC and the Niagara County Jail.[16] *People v. Armor Correctional Health Medical Services*, Index No. 450835/2016. The parties eventually settled the case, and Armor agreed "not to bid on or enter into any contract with any municipality in New York State for the provision of jail health services" for a three-year period. (ECF No. 80-3, ¶ 13.) Dorothea Caldwell-Brown, an Assistant Attorney General, submitted the results of her investigation in a sworn affirmation.[17] (ECF No. 71-17, Affirmation of Assistant Attorney General Dorothea Caldwell-Brown ("AAG Affirmation").) The investigation "revealed that Armor did not meet its contractual obligations, as evidenced by its inadequate self-auditing and continuous quality improvement processes, deficient sick call, deficient medical and mental health services, inadequate referrals to specialists, failure to maintain accurate and complete

---

[15] The National Commission on Correction Health Care ("NCCHC") establishes nationally recognized standards and benchmarks. (Comptroller Report at n. 27.)

[16] I take judicial notice of the lawsuit filed in state court. *See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992).

[17] The County defendants object to the admissibility of the affirmation because the settlement agreement provides that it is "not intended for use by any third party in any other action or proceeding[.]" (ECF No. 80 at 8) (quoting ECF No. 80-3, ¶ 10). The affirmation is admissible as a public record under Federal Rule of Evidence 803(8)(A)(iii) because it contains factual findings from a legally authorized investigation, and the defendants have not suggested that it lacks trustworthiness. *See Bradford Trust Co. v. Merrill Lynch*, 805 F.2d 49, 54-55 (2d Cir. 1986) (FBI reports prepared for related criminal action fall under the public records hearsay objection).

medical records and inadequate staffing." (*Id.* ¶ 11.) According to the affirmation, the Medical Review Board had found that five deaths between 2011 and 2015 at the NCCC, including Mr. Gleeson's, involved "egregious lapses in medical care." (Id. ¶ 9.)

The affirmation cited Mr. Gleeson's death as emblematic of Armor's "clear reluctance to send inmates for outside specialty care even when the inmates' medical condition cries out for attention often as assessed by Armor's own clinicians at NCCC." (*Id.* ¶¶ 150-162.) According to the affirmation, Armor's medical records demonstrated that "an Armor clinician referred [Mr. Gleeson] to a rheumatologist on two separate occasions" but that "Armor never ensured that the rheumatologist referral actually take place." (*Id.* at ¶ 162.) Armor's self-audits, the investigation found, reflected "a consistent pattern of inappropriate and failed practices relating to referrals to off-site specialists," including frequent failures to render a decision to deny or approve the request. (*Id.* at ¶¶ 153-57.)

The County paid Armor $49.7 million from June 1, 2011 through December 31, 2015. (Comptroller Report at i.) In March of 2016, the County issued a new RFP for medical services at the NCCC. (*Id.*)

## LEGAL STANDARD

Summary judgment is appropriate only if the parties' submissions, including deposition transcripts, affidavits, or other documentation, show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The movant has the burden of showing the absence of any genuine dispute as to a material fact. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997) (citation omitted). A fact is "material" when it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Barlow v. Male Geneva Police Officer Who Arrested Me on Jan. 2005*, 434 F. App'x 22, 25 (2d Cir. 2011) (internal citations omitted). Once the moving party has met its burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial. *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## DISCUSSION

### I.   The Plaintiffs' Section 1983 Claim

To prevail on a Section 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing 42 U.S.C. § 1983). A municipality is subject to liability for damages under Section 1983 for the unconstitutional acts of its employees "where…the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

The essence of the plaintiffs' claims is that Mr. Gleeson died as a result of deliberate indifference on the part of medical staff and prison officials at the NCCC, and that the defendants are liable for Mr. Gleeson's death because they had a policy or custom of delivering inadequate healthcare to NCCC inmates, which caused Mr. Gleeson's death. In seeking summary judgment, the defendants argue that the NCCC medical staff and prison officials were not deliberately indifferent to Mr. Gleeson's health. They say that they cannot be held liable even if Mr. Gleeson's death resulted from deliberate indifference because there was no policy or

custom to provide inadequate healthcare.

### a. *Deliberate Indifference*

"To establish a constitutional claim arising out of inadequate medical care, an inmate must prove that prison or jail officials were deliberately indifferent to his serious medical needs." *Gomez v. County of Westchester*, 649 Fed. Appx. 93, 95 (2d Cir. 2016) (citing *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003)). A pretrial detainee's claims of inadequate medical care are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See generally Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted); *Iancovangelo v. Correctional Medical Care, Inc.*, 624 Fed. Appx. 10, 12 (2d Cir. 2015) (citation omitted).

Under the Fourteenth Amendment, a plaintiff's claim for deliberate indifference to a serious medical need is analyzed under a two-part test. "First, the alleged deprivation of adequate medical care must be 'sufficiently serious.'" *Grimmet v. Corizon Med. Asssocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, at *3 (S.D.N.Y. May 24, 2017) (quoting *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)). "Second, the defendant must have acted with deliberate indifference, or a 'sufficiently culpable state of mind.'" *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### i. Sufficiently Serious Deprivation

I first decide whether the Mr. Gleeson experienced a medical deprivation that was "sufficiently serious." There must be an actual "deprivation of adequate medical care," that is, a failure by prison officials "to take reasonable measures" in response to a medical condition. *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 844-47 (1994)). Second, the deprivation must be "sufficiently serious." *Id.* at 280.

Because "the objective component of an Eighth Amendment [or Fourteenth Amendment] claim is necessarily contextual and fact specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (internal quotation marks and citation omitted). If the unreasonable medical care "is a failure to provide any treatment for an inmate's medical condition, courts examine whether the underlying medical condition is sufficiently serious," *Salahuddin*, 463 F.3d at 280, such as the existence of "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Arriaga v. Gage*, No. 16-CV-1628, 2018 WL 1750320, at *6 (S.D.N.Y. Apr. 6, 2018) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (citation omitted)). If a plaintiff alleges that the prison provided inadequate care—rather than a failure to provide any treatment—the inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]" *Smith*, 316 F.3d at 185 (citing *Chance v. Armstrong*, 143 F.3d 398, 702-03 (2d Cir. 1998)).

The defendants do not dispute that Mr. Gleeson suffered from a serious illness—hereditary angioedema—which causes recurrent attacks of severe swelling in the extremities, gastrointestinal tract, face, and airways. The disorder can be fatal when left untreated, particularly if the swelling has spread to the patient's neck and airway. Although the record does not show that Mr. Gleeson alerted the medical staff that he had hereditary angioedema, he made frequent complaints of his symptoms—including recurrent swelling and shortness of breath—to the medical staff. In four visits to the medical unit, Mr. Gleeson's symptoms of hereditary angioedema were progressively more serious, but the staff gave him the same treatment—a steroid and an antihistamine. Moreover, although the records reflect that medical personnel

thought he should see a rheumatologist, Mr. Gleeson never saw a rheumatologist or any specialist. The New York State Commission of Corrections concluded that this treatment was plainly inadequate, criticizing Armor for continuing Mr. Gleeson on an "ineffective course of treatment including antihistamines and steroids" when "a referral to a specialist (Rheumatologist) should have been of highest priority." (NYSCOC Final Report, ¶ 13.)

In my view, the plaintiffs have raised a triable issue of material fact about whether medical officials at the NCCC responded adequately to Mr. Gleeson's serious medical needs. *See Johnson v. Wright*, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) ("The fact that a plaintiff received regular medical care does not preclude a finding of deliberate indifference where the course of treatment was largely ineffective and the defendant declined to do anything more to attempt to improve the plaintiff's situation.") (quotation marks and citations omitted).

ii. Sufficiently Culpable State of Mind

The second element of a Fourteenth Amendment claim for inadequate medical care is that the defendant acted with "deliberate indifference" to the inmate's medical care. *Salahuddin*, 467 F.3d at 280 (citation omitted). In *Darnell v. Pineiro*, 849 F.3d 17, 32-36 (2d Cir. 2017), the Second Circuit held that a pretrial detainee need not demonstrate subjective awareness on the part of the official in a condition-of-confinement case. Since *Darnell*, district courts in this circuit have held that a pretrial detainee in a medical inadequacy case may establish deliberate indifference objectively. [18] *See Richardson v. Correctional Medical Care, Inc.*, No. 17-CV-0420, 2018 WL 1580316, at *4 (N.D.N.Y. Mar. 28, 2018) (collecting cases); *Lloyd v. City of*

---

[18] Before the Second Circuit's decision in *Darnell*, a pretrial detainee had to prove that the defendant official was subjectively aware of the harms associated with the constitutional deprivation. In *Darnell*, the Second Circuit changed the culpability standard for conditions-of-confinement cases in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), which applied an objective standard for excessive force claims brought by pretrial detainees under the Fourteenth Amendment. *Darnell*, 849 F.3d at 35.

*New York*, 246 F. Supp. 3d 704, 718-19 (S.D.N.Y. Mar. 31, 2017) ("After *Darnell*, deliberate indifference is now defined objectively…rather than ask whether the charged official knew of and disregarded an excessive risk to inmate health or safety, courts are to instead determine whether the official knew, or should have known that his or her conduct posed an excessive risk to health or safety.") (quotation marks and citation omitted). A pretrial detainee suing for deliberate indifference under the Fourteenth Amendment, is "required to show only that the prison official acted with objective recklessness, or that the defendant 'knew or should have known' that 'an excessive risk to health or safety' would result." *Grimmet*, 2017 WL 2274485, at *4 (quoting *Darnell*, 849, F.3d at 35). "As before, however, more than negligence is required to hold a defendant liable for violating" the Fourteenth Amendment. *Id.*

The plaintiffs have raised a triable issue of material fact about whether the medical officials knew or should have known about Mr. Gleeson's angioedema and the risks it posed to his health. Although Mr. Gleeson did not disclose that he had angioedema during his initial health assessment, doctors suspected almost immediately that angioedema was responsible for his swelling episodes. In fact, a physician's assistant noted angioedema as a possible diagnosis after Mr. Gleeson's first interaction with the medical staff. (Armor Medical Records at 61.) After his second visit to the medical unit, Dr. Sanchez ordered blood tests to measure Mr. Gleeson's levels of the C1 esterase inhibitor, a protein responsible for hereditary angioedema. (*Id.* at 27-28.) On the day of his death, Mr. Gleeson reported to the medical unit twice with neck swelling and redness in his throat; doctors again noted the possibility of hereditary angioedema, but sent him back to his cell with the same ineffective treatment of steroids and antihistamines. (*Id.* at 23.) According to the progress note from that day, Mr. Gleeson had a past medical history of "asthma, hives, angioedema, and HTN." (*Id.* at 24.) Given their suspicions of hereditary

angioedema, the doctors knew, or should have known, that Mr. Gleeson's symptoms were indicative of a potentially fatal condition. A reasonable jury could find that their failure to act amounted to deliberate indifference.

### b. *Parties Responsible for the Deliberate Indifference*

The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted). However, a municipal government, or a private entity acting under color of state law, *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 432 (S.D.N.Y. 2012), can be liable for the unconstitutional acts of its employees if the plaintiff can prove the existence of a municipal policy or custom that caused the constitutional violation. *Monell*, 436 U.S. at 690-91.

The only individuals named by the plaintiffs are "John Does 1-10"—corrections officers at the NCCC (ECF No. 1 ¶ 52), "John and Jane Does 11-20"—physicians, nurses, physician's assistants, and nurse practitioners employed by Armor (*Id.* ¶ 53), and Sheriff Michael J. Sposato. The plaintiffs assert *Monell* liability against the County of Nassau, the NCCC, the Nassau County Sheriff's Department, Armor Correctional Health Services, Inc., and Armor Correctional Health Services of New York.

The Armor defendants argue that the plaintiffs cannot sustain a Section 1983 action against "John Doe" and "Jane Doe" defendants at this point in the case. The County defendants argue that the claims against Sheriff Sposato should be dismissed because the complaint does not include sufficient allegations about his personal involvement in the constitutional violation. The County defendants also argue that the Court should dismiss claims against the NCCC and the Sheriff's Department because both are non-suable, administrative arms of the County of Nassau. Finally, all defendants argue that they cannot be held liable for Mr. Gleeson's death because the

22

plaintiffs have not demonstrated the existence of a policy or practice that caused the constitutional violation.

i. John Doe and Jane Doe Defendants

The defendants move for summary judgment as to the Section 1983 claims against the John Doe and Jane Doe defendants because they have not been identified, and any effort to name them now as defendants would be time-barred. The plaintiffs respond that the identities of the specific employees who personally inflicted the constitutional injuries are "irrelevant" because the entity defendants are responsible pursuant to *Monell*. (ECF No. 73 at 4.) In other words, the plaintiffs do not intend to press their claims against the individual doctors, nurses, corrections officers, and other staff at the NCCC responsible for Mr. Gleeson's constitutional injuries.

On January 17, 2017, Magistrate Judge Arlene R. Lindsay set a February 23, 2017 deadline for any request to join additional parties or amend the pleadings. Nevertheless, even though they learned the identities of relevant county and Armor employees through document discovery, (*see, e.g.*, Armor Medical Records), the plaintiffs have not sought to amend the complaint to name the "John Doe" corrections officers or the "John and Jane Doe" employees of Armor.

The applicable statute of limitations period in New York is three years for a Section 1983 action, *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (citation omitted), and the statute of limitations begins to run once the plaintiff knows of the injury on which its claim is based. *See Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994). The plaintiffs learned of Mr. Gleeson's death on July 14, 2014. Because substituting a named party for a John Doe defendant does not "relate back" to the complaint under Rule 15(c)(3), *Sepulveda v. City of New York*, No. 01-CV-3117, 2003 WL 22052870, at *2 (S.D.N.Y. Sept. 2, 2003), the plaintiffs' Section 1983 claims

against the "John Doe" and "Jane Doe" defendants are dismissed as time-barred. *See, e.g.*, *Vineyard v. County of Nassau*, 329 F. Supp. 2d 364, 369-60 (E.D.N.Y. 2004); *Cantave v. New York City Police Officers*, No. 09-CV-2226, 2011 WL 1239895, at *8 (E.D.N.Y. Mar 28, 2011).

### ii.  Sheriff Michael J. Sposato

The defendants argue that the plaintiffs cannot sue Sheriff Sposato in his individual capacity because the complaint includes no allegations that Sheriff Sposato was personally involved in the constitutional deprivation. The plaintiffs respond that the record reveals numerous examples of Sheriff Sposato's personal involvement in failing to supervise Armor's performance. The question for the Court is whether the plaintiffs have raised a triable issue of fact about Sheriff Sposato's personal involvement in the constitutional violations.

A supervisory official will not be found liable under Section 1983 simply by virtue of his "high position of authority." *Villafane v. Sposato*, No. 16-CV-3674, 2017 WL 4179855, at *12, (S.D.N.Y. Aug. 22, 2017) (quoting *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989)), *report and recommendation adopted*, 2017 WL 4157220 (E.D.N.Y. Sept. 15, 2017). Rather, a plaintiff in a Section 1983 action must show that the supervisor was personally involved in a constitutional violation by either: (1) directly participating in the violation; (2) failing to remedy the wrong after it comes to his attention; (3) creating a policy or custom under which unconstitutional practices occur, or allowing the continuation of such custom and policy; (4) being grossly negligent in supervising subordinates who committed the wrongful acts; or (5) failing to act on information indicating that unconstitutional acts are occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[19]

---

[19] *See generally Ramey v. Perez*, No. 13-CV-00017, 2014 WL 407097, at *4 (S.D.N.Y. Jan. 31, 2014) ("There has been considerable division among the district courts of the Second Circuit as to whether *Iqbal* abrogates several factors of the *Colon* test and if so to what extent....*Colon* remains the standard in this Circuit for deciding whether personal involvement by supervisory officials is sufficiently alleged

While there is no evidence that Sheriff Sposato participated directly in the violation (factor one), or was alerted to Mr. Gleeson's ongoing mistreatment and failed to intervene (factor two), there are issues of fact precluding summary judgment as to Sheriff Sposato's personal involvement under the third, fourth, and fifth factors. Indeed, as Sheriff, he was entrusted with supervisory responsibility for Armor. For example, the four final reports from the NYSCOC in the record are addressed to Sheriff Sposato, and each faults Armor for egregiously inadequate care. Sheriff Sposato received one report, before Mr. Gleeson's death, in which the Commission found that Armor "was grossly incompetent," and recommended that the Nassau County Executive "conduct an inquiry into the fitness of Armor...as a correctional medical care provider." (ECF No. 71-31, at 9.) Furthermore, the Sheriff's Department—headed by Sheriff Sposato—did not appoint a doctor to be the Health Contract Administrator from 2011 to 2016, and the nurse who held the position left in 2013; the Sheriff's Department left the position completely vacant until 2016, when it appointed an interim HCA and published job postings for a permanent position. Finally, the contract required that Sheriff Sposato receive written reports from the Quality Improvement Committee. The Attorney General's investigation found that these reports failed to include data on approximately half of the twenty-four indicators required by the contract.

A reasonable jury could find that Sheriff Sposato should have known about the risk of constitutional violations because he received the report questioning Armor's fitness as a medical care provider.[20] *Villafane*, 2017 WL 4179855, at *14 (to establish personal involvement under

---

in the context of the Eighth Amendment.").

[20] The AAG affirmation references three other deaths—before Mr. Gleeson's—where the Medical Review Board found that Armor was responsible for egregious lapses in medical care. (AAG Affirmation ¶ 9.) These findings support the conclusion that Sheriff Sposato should have known about the risk of constitutional violations, a question that is ultimately for a jury.

the fourth factor, "a plaintiff must demonstrate that the defendant knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately...but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk...") A reasonable jury could also find that, in the aftermath of the NYSCOC report, Sheriff Sposato's failure to designate a Health Contract Administrator, or otherwise monitor or discipline Armor medical personnel through the tools available to him from the contract, allowed Armor's practice of inadequate medical care to continue unabated. Accordingly, the motion for summary judgment as to Sheriff Sposato in his personal capacity is denied.[21]

### iii. NCCC and NCSD

It is well established that neither the Nassau County Correction Center nor the Nassau County Sheriff's Department are suable entities. *See Joseph v. Nassau Cty. Corr. Ctr.*, No. 12-CV-4414, 2013 WL 1702162, at *3 (E.D.N.Y. Apr. 19, 2013) (collecting cases). Rather, they are administrative arms of Nassau County without a separate legal identity from the County. *Campbell v. Sposato*, 15-CV-1958, 2015 WL 9267222, at *5 (E.D.N.Y. Nov. 17, 2015) (interpreting the Nassau County Charter), *report and recommendation adopted*, 2015 WL 9273951 (E.D.N.Y. Dec. 16, 2015). Accordingly, I grant summary judgment in favor of the NCCC and NCSD, and dismiss them from this action.

---

[21] The plaintiffs also have sued Sheriff Sposato in his official capacity. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "[T]hus, within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." *Stancati v. County of Nassau*, No. 14-CV-2694, 2015 WL 1529859, at *2 (E.D.N.Y. Mar. 31, 2015) (quotation marks and citation omitted). A suit against Sheriff Sposato in his official capacity will be treated and analyzed as a suit against Nassau County, and the claim against Michael J. Sposato as Sheriff of Nassau County is dismissed as duplicative and redundant.

iv. <u>Armor</u>

As noted above, a prerequisite to recovery under Section 1983 "is that the alleged constitutional violation be committed by one acting under color of law." *Bektic-Marrero*, 850 F. Supp. 2d at 426 (citing *West v. Atkins*, 487 U.S. 42, 48-50 (1988)). "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citations and internal quotation marks omitted).

The parties agree that the Armor defendants "are considered to be state officials...[d]espite being privately owned and operated entities[.]" (ECF No. 60-5, Armor Defs.' Br. at 9); *see also Ryan v. County of Nassau*, No. 12-CV-5343, 2016 WL 11500151, at *7 (E.D.N.Y. Mar. 31, 2016) ("Since Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, the Court finds that it was a state actor that can be sued pursuant to Section 1983.") (citations and internal quotation marks omitted). "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal government and not to private entities acting under color of state law, case law has extended the *Monell* doctrine to private § 1983 defendants acting under color of state law." *Dilworth v. Goldberg*, No. 10-CV-2224, 2011 WL 3501869, at *24 (S.D.N.Y. July 28, 2011), *report and recommendation adopted*, 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011). Therefore, a private entity acting under color of state law will be liable for the constitutional violations of its employees if they resulted from the entity's policies or customs. *Id.*

A plaintiff may satisfy the "policy or custom" requirement by establishing "(1) a formal policy; (2) action taken or decisions made by policymakers that caused the violation; (3) a practice so persistent and widespread that it constitutes a 'custom or usage;' or (4) a failure to

properly train or supervise [entity] employees." *Byvalets v. New York City Hous. Auth.*, No. 16–CV–6785, 2017 WL 7793638, at *14 (E.D.N.Y. July 28, 2017), *report and recommendation adopted*, 2018 WL 1067732 (E.D.N.Y. Feb. 23, 2018) (citing *White v. City of N.Y.*, 206 F. Supp. 3d 920, 937 (S.D.N.Y. 2016) (citation omitted)). The plaintiffs posit the existence of both a formal policy and informal practices at Armor.

For the formal policy, the plaintiffs point to Armor's requirement that an inmate could see a specialist or visit a hospital only after an official in Armor's Florida corporate offices approved the referral, in writing, and within thirty days of the request. According to the plaintiffs, Mr. Gleeson died while those necessary referrals were pending approval. (ECF No. 73, Pls.' Opp. Br. at 11) ("[Dr. Sanchez] made the request on two separate occasions for the decedent's referral to a rheumatologist, both well-before John Gleeson's death. The referral never happened."). Under the plaintiffs' theory, Armor's referral policy prevented Mr. Gleeson from receiving adequate medical care and resulted in his death.

It is undisputed that Armor followed a protocol that required clinicians at the NCCC to submit referral requests to Armor directors in Florida. The record also shows that Armor clinicians noted in medical records that Mr. Gleeson should see a rheumatologist for his recurrent swelling. Mr. Gleeson himself believed that he was "on the list to see a different doctor.... a rheumatologist." (ECF No. 57-12, 4:36-5:06.) It is not clear from the medical records whether doctors or PAs made a specific referral for Mr. Gleeson to see a rheumatologist; that is due in large part to the fact that the records are illegible. Certainly, there are multiple references to both hereditary angioedema and rheumatologists in the medical records. Drawing all reasonable inferences in favor of the plaintiffs, I find that there is a triable issue of fact as to whether Armor's referral request policy prevented Mr. Gleeson from seeing a rheumatologist,

28

and caused his death.[22] Furthermore, a reasonable jury could find that Armor's woefully deficient record-keeping and its failure to install an electronic medical records system contributed to Armor's failure to ensure that the rheumatologist referral actually took place.[23]

The plaintiffs also argue that Armor had informal practices and customs that caused Mr. Gleeson's inadequate medical treatment. To prove the third *Monell* kind of liability—custom or usage—the plaintiff must establish a longstanding practice or custom which constitutes standard operating procedure. *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989). The policy must be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Byvalets,* 2017 WL 7793638, at *16 (quoting *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 871 (2d Cir. 1992)). In other words, the relevant practice must be "so widespread as to have the force of law." *Board of County Comm'rs. v. Brown*, 520 U.S. 397, 404 (1997) (citations omitted).

The thrust of the plaintiffs' argument is that the Armor defendants had a widespread and well-settled custom of providing inadequate medical care to prison inmates. Judges have defined "widespread" to mean that the unconstitutional acts in question are "common or prevalent throughout the [entity]" and "well-settled" to mean that the unconstitutional acts "have achieved permanent, or close to permanent, status." *Fowler v. City of New York*, No. 13-CV-2372, 2019 WL 1368994, at *14 (E.D.N.Y. Mar. 26, 2019) (quoting *Davis v. City of New York*, 228 F. Supp. 2d 327, 346 (S.D.N.Y. 2002)). "There is no 'magic number' of instances of unconstitutional

---

[22]There is substantial evidence in the record that Mr. Gleeson would not have died if he had been seen by a rheumatologist. (ECF No. 71-6 ¶ 22; NYCOC Report ¶ 13 ("Had Gleeson been appropriately referred to a specialist, received a correct diagnosis, and received the proper treatment, his terminal event may have been prevented.")).

[23] Armor's proposed electronic medical records system, which it did not implement, could, for example, generate reports of "[p]atients' pending consultations with specialists." (2011 Armor Contract at 231.)

conduct that will suffice to permit the inference of a broader [entity] policy of custom." *Id*
(citations and internal quotations omitted).

The Comptroller report, AAG affirmation, and NYSCOC reports about the treatment of

inmates Kevin Brown (ECF No. 71-30), Roy Nordstrom (ECF No. 71-31), and Antonio

Marinaccio (ECF No. 71-32) detail Armor's "egregious lapses in medical care" and its "pattern"

of inadequate care. Accordingly, the plaintiffs have raised a genuine issue of material fact as to

whether the Armor defendants have a widespread and well-settled custom of providing

inadequate medical care to prison inmates *See Pipitone v. City of New York*, 57 F. Supp. 3d 173,

191 (E.D.N.Y. 2014) ("[T]he Mollen Report provides powerful evidence that there was a custom

and practice within the police department of tolerating corruption to avoid bad publicity. It

characterizes this custom as persistent, widespread, and emanating from top commanders,

including the police commissioner. The Mollen Report thus provides evidence that is sufficient

to allow a jury to conclude that the supervisory and disciplinary failures described therein

constituted a municipal policy for *Monell* purposes and that the City's handling of the Eppolito

matter was reflective of that policy.") (citations omitted).

The cases in which other courts in this Circuit rejected the findings of a government

report as evidence of a policy or practice involved events that were too far removed from the

plaintiffs' case to be probative of a then-existing policy or practice. *See, e.g. Moses*, 2017 WL

4386362, at *12 (DOJ report analyzing excessive force incidents from 2006 to 2007 is "too

disconnected in time and personnel to plausible allege a policy, practice, or custom extant in

2000 so as to affect [the plaintiff]."); *Rodriguez v. City of Westchester*, No. 15-CV-9626, 2017

WL 118027, at *7 (S.D.N.Y. Jan. 11, 2017) (DOJ report written more than six years before the

events in question occurred, and involving different third-party contractors, was "too stale, and

too disconnected in personnel, to plausibly allege a policy, practice, or custom extant in 2014 so as to affect [the plaintiff].")*; Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *15 (S.D.N.Y. Mar. 29, 2016) (DOJ letter was too remote in time because it was written more than four years before the events in question and involved a different third-party contractor).

This case is different. The Comptroller's report and the AAG's affirmation detail the same kinds of inadequate medical care, the same party (Armor), and the same time frame (2011 to 2014), as the events alleged by the plaintiffs. In fact, the AAG affirmation cited Mr. Gleeson's death as emblematic of a subset of Armor's inadequate medical care. Accordingly, the reports are sufficient to create a jury question regarding whether Armor had a custom of providing inadequate medical care that resulted in Mr. Gleeson's death.

## v. Nassau County

The County argues as a threshold matter that it cannot be held liable for any inadequate medical care on the part of the Armor medical staff because the Armor medical team "made all the treatment decisions" as the "exclusive medical provider of the NCCC." (ECF No. 80 at 2.) Municipalities cannot shield themselves from liability by delegating inmate medical care to third-party, private entities. *See Gil v. Vogilano*, 131 F. Supp. 2d 486, 493 (S.D.N.Y. 2001) ("[A] municipality's duty to provide medical care to inmates is non-delegable and is not absolved by contracting with a third party to provide care.") (citations omitted). However, that does not mean that the County is automatically liable for Armor's inadequate medical care. Only a few courts in this district have held that *respondeat superior* is a viable theory of liability in cases involving the failure to provide adequate medical care. *See e.g. Covington v. Westchester County Jail*, No. 96-CV-7551, 1998 WL 26190, at *2-3 (S.D.N.Y. Jan. 26, 1998); *McNeil v.*

*Correctional Medical Care, Inc.*, No. 18-CV-0894, 2019 WL 4415528, at *10 (N.D.N.Y. Sept. 16, 2019). These courts follow *Ancata v. Prison Health Servs. Inc.*, 769 F.2d 700 (11th Cir. 1985), a decision that has not been adopted in this Circuit. I will follow the majority view that there is no *respondeat superior* liability for municipalities under Section 1983—including for inadequate medical care cases involving private vendors—and that the plaintiffs must identify a "policy" or "custom" to impose liability on a municipality.

Accordingly, as with the Armor defendants, the plaintiffs must identify a "policy" or "custom" that caused Mr. Gleeson's injury in order to impose liability on Nassau County. The plaintiffs are entitled to establish a "policy" or "custom" through one of the four methods set forth above. Here, the plaintiffs argue that the County failed to supervise Armor.[24]

A failure to supervise "may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray v. City of New York*, 490 F.3d 189, 195-96 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). To prevail on this theory, the plaintiffs must demonstrate that "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2004) (citation omitted). "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence 'may be properly thought

---

[24] The plaintiffs also argue that the County's approval and renewal of its contract with Armor constitutes an official policy. (ECF No. 70 at 22.) A decision adopted by a municipal body is, of course, an officially promulgated policy for the purposes of *Monell* liability. *Monell*, 436 U.S. at 690. But the County's approval of the Armor contract is too far removed from Mr. Gleeson's treatment to support the requisite causal connection. *Pipitone*, 57 F. Supp. 3d at 194 ("Municipalities can only be liable under § 1983 when they are a 'moving force' behind the constitutional deprivation.") (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

of as a city policy or custom that is actionable under § 1983." *Id.* (quoting *City of Canton*, 489 U.S. at 388).

To prove such deliberate indifference, "the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious…An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (internal citation omitted).

The plaintiffs argue that the County's failure to address the "rash of inmate deaths at the NCCC since 2011" evinces deliberate indifference. (ECF No. 70 at 26.) The plaintiffs point to the NYSCOC reports, which were addressed to Sheriff Sposato and the Presiding Officer of the Nassau County Legislature, as evidence of policymakers' notice of recurring constitutional violations. The County responds that they were not on notice of Armor's inadequate treatment because the Comptroller's report and the AAG's affirmation were issued at least two years after Mr. Gleeson's death. This defense is not persuasive. The plaintiffs do not argue that those reports put the County on notice of a pattern of inadequate health care at the NCCC. Rather, they argue that the NYSCOC reports provided the requisite notice, and that the Comptroller's report and the AAG's affirmation confirm the existence of repeated past issues involving Armor that the County knew of and ignored.

The record includes one report issued before Mr. Gleeson's death—*In the Matter of the Death of Roy Nordstrom* (ECF No. 71-31)—that faults Armor for an egregious lapse in medical care. The report is addressed to Sheriff Sposato and copied to Edward P. Mangano, who was then the Nassau County Executive. The Medical Review Board concluded that Armor provided

"grossly incompetent" care that contributed to the Mr. Nordstrom's death from acute myocardial infarction. The Board issued the following directive to the Nassau County Executive:

> The Office of the Nassau County Executive shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's flagrant disregard of New York State Education Law, of the Rules of the Board of Regents, and of New York State nursing practice regulations, to wit, staffing unsupervised Licensed Practical Nurses at the Correctional Center who engaged in nursing practice beyond the scope of their licensure and in unlawful medical practice, who failed to consult with and refer to a physician in a medical emergency, and who failed to hospitalize a critically ill patient.

(ECF No. 71-31, at 9.)

A reasonable jury could find that the report about Mr. Nordstrom alerted Nassau County, through its policymakers Sheriff Sposato and Nassau County Executive Mangano, to a potentially serious problem of unconstitutional conduct, such that the need for supervision was "obvious."[25] *See also Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011) (based on a single prior incident of sexual contact between a prisoner and prison guards, a jury could reasonably conclude that the municipality was on notice that its policies in that area were inadequate); *Carter v. Broome County*, No. 16-CV-422, 2019 WL 3938088, at *9 (N.D.N.Y. Aug. 21, 2019) ("[S]ummary judgment on a plaintiff's *Monell* claim is inappropriate if a fact-finder could find systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system *and* that a policy-making official knows about them and fails to correct them.") (citation and quotation marks omitted). Rather than address the obvious need

---

[25] The AAG affirmation references three other deaths, before Mr. Gleeson's, in which the Medical Review Board found that Armor engaged in egregious lapses in medical care. (AAG Affirmation ¶ 9.) These repeated findings of civil rights violations buttress the conclusion that by the time of Mr. Gleeson's detention, the County had notice of serious problems of unconstitutional conduct requiring better supervision.

for closer supervision, the County scaled back its oversight. For example, the County left the Health Contractor Administrator position vacant beginning in August 2013, and assessed no penalties on Armor for contract violations, including Armor's failure to achieve NCCHC accreditation. The Comptroller found that the County "failed to provide adequate oversight to ensure that Armor was in compliance with its contract with the County." (Comptroller Report at ii.) The plaintiffs have raised a genuine issue of material fact as to whether these failures to supervise Armor amount to deliberate indifference to the rights of inmates at the NCCC.

## II. The Plaintiffs' State Law Claims

### a. *Wrongful Death*

The Armor defendants' motion for summary judgment on the plaintiffs' wrongful death claim is denied. As discussed above, there are genuine issues of material fact as to whether the Armor medical staff acted with "deliberate indifference," which is a standard akin to objective recklessness. *Grimmet*, 2017 WL 2274485, at *4 (quoting *Darnell*, 849 F.3d at 35). Further, under New York law, "an employer will be vicariously liable for the acts of his employee when these acts are within the general scope of his employment, while engaged in the master's business, and with a view to the furtherance of that business and the master's interest." *Medley v. City of New York*, No. 94-CV-3708, 1998 WL 938731, at *3 (E.D.N.Y. Dec. 3, 1998) (citation omitted). Accordingly, summary judgment cannot be entered in favor of the Armor defendants because there are triable issues of fact as to whether the Armor employees acted negligently, and in the scope of their employment, in causing Mr. Gleeson's death. *See Chong v. N.Y.C. Transit Auth.*, 83 A.D.2d 546, 547 (N.Y. App. Div. 1981) (elements of wrongful death claim include: (1) death of a human being, (2) negligence of a defendant causing death, (3) survival of distributees suffering pecuniary loss because of the death, and (4) appointment of a personal representative of

the decedent).

The County defendants' motion for summary judgment on the plaintiffs' wrongful death claim is also denied. Under New York law, an entity or hospital may be vicariously liable for the negligence of independent contractors in certain circumstances based on a theory of "agency or control in fact, or apparent or ostensible agency." *See Garofolo v. State*, 135 A.D.3d 1108, 1109 (N.Y. App. Div. 2016) (citations omitted). The "ostensible agency" theory imposes vicarious liability on an entity defendant for the negligence of an independent contractor doctor "when an inmate has reasonably relied upon the appearance of the doctor's authority created by the words or conduct of [the entity]." *Id.* The availability of the theory depends on "whether the plaintiff could have reasonably believed, based upon all of the surrounding circumstances, that the treating physician was provided by the defendant or was otherwise acting on the defendant's behalf." *Id.* at 1110 (alteration omitted) (quoting *Soltis v. State of New York*, 172 A.D.2d 919, 920 (N.Y. App. Div. 1991)).

Here, the Armor medical staff treated Mr. Gleeson in the prison facility on multiple occasions. A reasonable jury could find that Mr. Gleeson could have reasonably believed that the County employed the Armor medical staff. *Compare Soltis*, 172 A.D.2d at 920 (the fact that the plaintiff was treated at the state facility, with the assistance of state officials, precluded summary judgment as to the state's vicarious liability for the negligence of the independent contractor), *with Garofolo*, 135 A.D.3d at 1110 (the plaintiff could not reasonably believe that the doctors were employed by the prison because the plaintiff's treatments "took place outside of the prison without the involvement of any prison employees.") Accordingly, summary judgment is denied.

     b. *Intentional Infliction of Emotional Distress*

Intentional infliction of emotional distress has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 239-40 (E.D.N.Y. 2015) (quoting *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115 (1993)). The "extreme and outrageous conduct" must "go beyond all possible bounds of decency" and be "atrocious, and utterly intolerable in a civilized community." *Greenaway*, 97 F. Supp. 3d at 239-40 (citations omitted). The tort "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal citation and quotation marks omitted).

Even drawing all inferences in the plaintiffs' favor, the record does not sustain an intentional infliction of emotional distress claim. There is no evidence about the mindset of the defendants or their employees, in part because the plaintiffs did not depose them. Furthermore, no reasonable juror would find that the evidence on this record establishes conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *See Chanko v. Am. Broad. Cos. Inc.*, 27 N.Y.3d 46, 56 (2016). As discussed above, there is a triable issue of fact as to whether the defendants acted with deliberate indifference or negligently. These traditional claims may provide relief at trial; accordingly, the plaintiffs' claim for intentional infliction of emotional distress is dismissed.[26]

## III.    Damages

The Armor defendants make three damages-related arguments in their motion for

---

[26] Even if the plaintiffs could sustain the intentional infliction of emotional distress claim, it would be dismissed as to the County defendants. *See J.H. v. Bratton*, 248 F. Supp. 3d 401, 416 n.10 (E.D.N.Y. 2017) ("It is well settled that public policy bars claims sounding in intentional infliction of emotional distress against a government entity.") (quoting *Lauer v. City of N.Y.*, 240 A.D.2d 543 (N.Y. 1997)).

summary judgment. First, they claim that the plaintiffs cannot sustain a claim for attorneys' fees under 42 U.S.C. § 1988 because the plaintiffs "cannot be a prevailing party on any of the civil rights claims set forth in this litigation." (ECF No. 60-5, at 15.) As discussed above, the plaintiffs' civil rights claims will be tried before a jury. Accordingly, dismissing the plaintiffs' request for attorneys' fees is premature.

Second, the defendants claim that the plaintiffs cannot recover pecuniary losses beyond funeral expenses in connection with their wrongful death claims. Damages in a wrongful death action are limited to compensation for "pecuniary loss," which is defined as "the economic value of the decedent to each distributee at the time decedent died," and includes "loss of income and financial support, loss of household services, loss of parental guidance, as well as funeral expenses and medical expenses incidental to death." *Milczarski v. Walaszek*, 108 A.D.3d 1190 (App. Div. 2013) (internal citations omitted). "To recover on their wrongful death claims, plaintiffs must present an evidentiary basis for a reasonable expectation of pecuniary loss from decedent's death." *Datskow v. Teledyne Continental Motors Aircraft Products*, 807 F. Supp. 941, 945 (W.D.N.Y. 1992) (quoting *Public Administrator of Kings County v. U.S. Fleet Leasing of New York, Inc.*, 159 A.D.2d 331, 332 (N.Y. 1990)). Generally, "because it is difficult to provide direct evidence of wrongful death damages, the calculation of pecuniary loss is a matter resting squarely within the province of the jury." *Milczarski*, 108 A.D.3d at 1190 (quoting *Parilis v. Feinstein*, 49 N.Y.2d 984, 985 (1980)).

The plaintiffs have raised an issue of triable fact as to whether the plaintiffs have a reasonable expectation of pecuniary loss from Mr. Gleeson's death that exceed funeral expenses. First, the plaintiffs established that Mr. Gleeson provided household services to his parents, ex-wife, and children. (*See, e.g.,* M.G. Dep. 21:8-13; ECF No. 61-5, 326:6-12.) Second, the

plaintiffs established that Mr. Gleeson provided financial support to his children pursuant to a divorce judgment, although he was in arrears at the time of his death, as well as contributions for vacations, holiday gifts, back to school clothing, sports equipment, and sports team fees. (ECF No. 61-5, 317:3-319:19.) Finally, the plaintiffs established that Mr. Gleeson had a relationship with his children. (M.G. Dep. 298:11-20.) In light of these facts, I will not find as a matter of law that the plaintiffs have suffered no pecuniary losses apart from funeral expenses. *See, e.g. Ryan*, 2016 WL 11500151, at *8 ("Although the record concerning potential pecuniary loss is quite limited, the Court cannot find as a matter of law that Plaintiff suffered no pecuniary injury beyond the recovery of Ryan's funeral expenses.")

Third, the Armor defendants claim that they cannot be sued for punitive damages. Courts have held that entities acting under color of state law "are not afforded the same immunities from liability as are available to the municipality." *Phelan ex rel. Phelan v. Torres*, No. 04-CV-3538, 2005 WL 4655382, at *16 (E.D.N.Y. Sept. 20, 2005)[27] (non-for-profit corporation under contract with a municipality cannot be shielded from punitive damages). Punitive damages may be awarded only when the plaintiff has demonstrated that the defendants' conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Nevertheless, "[g]enerally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of plaintiff's proof of 'sufficiently serious misconduct.'" *Phelan*, 2005 WL 4655382, at *15 (citation omitted). Accordingly, the Armor defendants can be sued for punitive damages, and their motion for summary judgment on the issue of punitive damages is dismissed.

## CONCLUSION

---

[27] The Honorable Edward Korman adopted the report and recommendation in an unpublished order on November 28, 2005.

The Court grants summary judgment for Defendants "John Does 1-10," "John and Jane Does 11-20," the Nassau County Correctional Center, the Nassau County Sheriff's Department, and Michael J. Sposato in his official capacity as Sheriff of Nassau County, and dismisses them from the case. The defendants' motion for summary judgment on the intentional infliction of emotional distress claim is also granted as to all remaining defendants. The Court denies summary judgment to Sheriff Sposato in his individual capacity, Nassau County, and Armor on all remaining claims.

**SO ORDERED.**

s/Ann M. Donnelly

_____
Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
  September 30, 2019